## In Re: Recount of Ballots.

Argued May 2, 1974. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused August 7, 1974.

*Clarence D. Neish,* for appellant at Nos. 89 and 113, and appellee at No. 114.

*John J. Petrush,* with him *Morgan H. Sohn* and *Gretchen Sohn Reed,* for appellee at Nos. 89 and 113, and appellant at No. 114.

OPINION BY MR. JUSTICE NIX, July 1, 1974:

On November 6, 1973, the voters of Beaver County were called upon to elect two individuals for the position of Judge of the Court of Common Pleas for that County. Three candidates aspired for these two seats.

H. Beryl Klein, Esq. (now the Honorable H. Beryl KLEIN) had received the nomination of both political parties in the Spring Primary; Robert C. Reed, Esq. and Joseph S. Walko, Esq. were the nominees of the Republican and Democratic parties respectively for the second seat to be filled. After the general election returns had been computed and canvassed by the County Board of Elections, the total vote for each candidate was as follows: Klein: 41,753; Walko, 30,569; and Reed: 30,355. Within five days after the completion of the computation and canvassing of all of the returns of the County by the County Board, petitions were filed on behalf of candidates Walko and Reed requesting that a total of 112 election district ballot boxes be opened and recounted pursuant to the Act of June 3, 1937, P. L. 1333, §§1701 and 1703, 25 P.S. §§3261 and 3263. The Court thereupon appointed three Recount Boards of five members each to recount the votes in the districts requested. The returns of the Recount Boards listed the votes for the candidates as follows: Klein: 41,501; Reed: 30,598; and Walko: 30,591. Both Reed and Walko challenged the ruling of the Recount Boards.

After a voluntary disqualification by the judges of Beaver County this Court specially assigned the Honorable F. Joseph THOMAS "to determine the validity of challenges made before the Recount Boards and to rule thereon".[1] These appeals are from the Order of the court below ruling upon the contentions of both Reed and Walko which have been consolidated for the purposes of argument and disposition by this Court.

---

[1] Order filed: December 27, 1973. In addition to a review of the challenges to the ruling of the Recount Boards, the court below also considered two petitions filed on behalf of candidate Walko, one requested the opening of ballot boxes in 34 additional election districts which had not been the subject of the initial recanvassing and secondly, that there be a second recount in the 112 election districts that were the subject of the initial recount.

## Candidate Walko's Request to Reopen the Ballot Boxes in the Remaining 34 Election Districts

The court below ruled that because of Walko's failure to comply with the pertinent provisions of the Act he was not entitled to this request. We agree.

Section 1701[2] and Section 1703[3] permit the recanvassing of the votes in an election district where there

---

[2] "(a) The court of common pleas, or a judge thereof, of the county in which any election district is located in which ballots were used, shall open the ballot box of such election district used at any general, municipal, special or primary election held therein, and cause the entire vote thereof to be correctly counted by persons designated by such court or judge, if three qualified electors of the election district shall file, as hereinafter provided, a petition duly verified by them, alleging that upon information which they consider reliable they believe that fraud or error, although not manifest on the general return of votes made therefrom, was committed in the computation of the votes cast for all offices or for any particular office or offices in such election district, or in the marking of the ballots, or otherwise in connection with such ballots. . . .

"(b) Every petition for the opening of a ballot box under the provisions of this section shall be filed in the office of the prothonotary of the proper county, accompanied by a deposit of cash in the amount of fifty ($50.00) dollars, or by a bond signed by the petitioners as principals and by a corporate surety to be approved by the court, in the amount of one hundred ($100.00) dollars, conditioned upon the payment to the county treasurer for the use of the county of the sum of fifty ($50.00) dollars, in the event that, upon the opening of the ballot box, it shall not appear that fraud or substantial error was committed in the computation of the votes cast on the ballots contained therein, or fraud in the marking of the ballots contained therein, or otherwise in connection with such ballots."

[3] "(a) If any petition to open a ballot box or to recanvass the votes on a voting machine shall have been presented, under the provisions of sections 1701 and 1702 of this act, before the certification of all the returns of the county, and, in no event, later than five (5) days after the completion of the computation and canvassing of all the returns of the county by the county board, and

has been a petition filed which has been signed and verified by three qualified electors of the election district involved accompanied by a cash deposit or bond and the petition is presented within five days from the completion of the computation and canvassing of all returns of the county by the County Board of Elections. In this instance, the Petition to Open the remaining 34 election district ballot boxes was signed and verified only by the candidate, it was not accompanied by the required security and was not filed until 29 days (December 31, 1973) after the County Board had certified its returns (December 3, 1973).

Candidate Walko admits non-compliance with the provisions of §§1701 and 1703 and argues that he was entitled to this remedy pursuant to the Act of June 3, 1937, P. L. 1333, art. XIV, §1407, 25 P.S. §3157. This section provides in pertinent part: "(a) Any person aggrieved by any order or decision of any county board regarding the computation or canvassing of the returns of any primary or election, or regarding any recount or recanvass thereof under sections 1701, 1702 and 1703 of this act, may appeal therefrom within two days after such order or decision shall have been made, whether then reduced to writing or not, to the court of common pleas of the proper county, setting forth why he feels that an injustice has been done, and praying for such order as will give him relief. . . ." The only conceivable basis for the Petition filed on December 31, 1973, to be timely under the two-day statutory limit prescribed under §1407 would be that this Petition was in response

the court shall discover therein any fraud or error, the court shall correct, compute and certify to the county board the votes justly, regardless of any fraudulent or erroneous entries made by the election officers thereof, and the county board shall correct accordingly any entries previously made in the returns of the county being prepared by it, or which have been prepared and not yet certified."

to the Recount Boards'[4] returns which were completed and filed on December 28, 1973.[5]

We cannot, however, accept that even assuming that Walko was successful in establishing that he was aggrieved by the decision of the Recount Boards as to the recanvass of the ballots cast in the 112 election districts this grievance could be rectified by permitting a belated recount of additional election districts not included in the first recanvass. Clearly, this at best is an ingenious attempt to extend the time to request a recount of the remaining election boxes within the County which we will not permit.

Candidate Walko, in the alternative, argues that even if the appeal is deemed to have been untimely filed, he should nevertheless be permitted to proceed by way of an appeal *nunc pro tunc*. In urging this position, he relies heavily upon this Court's decision in *Koch Election Contest Case*, 351 Pa. 544, 41 A.2d 657 (1945). We believe this reliance to be misplaced. In *Koch*, the posted return had shown that the candidate who received the majority of the votes cast had been duly elected. Thereafter, the County Board of Elections negligently computed the returns and returned a majority of the votes for the opposing candidate and, although recognizing their error, failed to correct it. There it was clear that the Board had lulled Koch into a false sense of security and this Court properly observed: ". . . the only appropriate remedy by which the negligence of the election board could be corrected was

---

[4] Because of the large number of votes to be recounted, the lower court appointed three Recount Boards of five members each to recount the votes in the districts requested.

[5] December 28, 1973 was a Friday and December 31, 1973 was a Monday. Clearly a petition filed on December 31, 1973, in view of the intervening days being Saturday and Sunday, would be in compliance with the two-day limit set forth in §1407. See *Williams Appeal*, 434 Pa. 274, 256 A. 2d 623 (1969).

by an appeal *nunc pro tunc* for a recount under Section 1407, 25 P.S. section 3157." *Koch,* supra at 550, 41 A.2d at 660. In this case, even though the original returns may have led Walko to believe that he was a winner, it has not been shown that it was a result of a deliberate intention to mislead or of negligence on the part of the County Board. Further, both parties realized their precarious position and did in fact request and were granted the right to open those boxes that they requested to be opened. Had Walko so chose, he could, at that time, have expanded his request to include the 34 districts now involved. He elected not to do so and cannot now offer his disappointment with the result of the recanvass as a basis to modify his original request.

Compliance with statutorily imposed time limitations is especially important in election cases. This point was made clear in *Turtzo v. Boyer,* 370 Pa. 526, 531, 88 A.2d 884, 886 (1952) when this Court said: "It is because the lawmakers of the State were aware of the inertia inherent in an unestimated percentage of the population, and the great harm which can be visited upon others because of that inertia, that it categorically established time limits for the various procedures required in the operation of the Pennsylvania Election Code. Unless time limits were set within which to challenge the results of elections, government would permanently sit on a shaky foundation, and the citizenry would never be certain of the identity of the officeholder chosen to direct and operate the complex activities of the State, County and Municipality. Civilization must protect itself from the sluggard, as well as from the evil-doer. The lazy railroad watchman, who fails to lower a safety gate in time, can inflict as much harm on innocent passengers as the bandit who holds up the train."

## Candidate Walko's Request for a Second Recanvass of the 112 Boxes

Secondly, appellant Walko alleges error in the lower court's refusal to order a second recount of the ballots of 112 boxes previously recounted. Certainly the court had the power to order a second recount, *Greenwood Township Election Case*, 344 Pa. 350, 25 A.2d 330 (1942). However, in *Passante Appeal*, 447 Pa. 304, 308, 290 A.2d 69, 71 (1972) we said: "This does not mean that a second recount is mandatory if some interested party alleges such a mistake, but rather that the court may order a second recount if it is convinced such a mistake occurred. Here the lower court was apparently satisfied that the computation made by the board in the first recount was correct and the record does not evidence any meritorious reason why this conclusion should not be affirmed." In view of the nature of an election where finality is of utmost importance multiple recounts should be permitted only in the face of manifest error. Here the record does not evidence any manifest error which would require reversing the lower court's refusal to order a second recount.

## Challenges to the Lower Court's Rulings Upon the Validity of the Recanvassed Ballots

These complaints can be broadly divided into two basic categories. The first complaint is raised by candidate Walko to the refusal of the Recount Boards to count ballots which were deposited in the various voting boxes without the perforated corner containing the identifying numbers being removed. Act of June 3, 1937, P. L. 1333, art. XII, §1215, as amended, 25 P.S. §3055 (1963). The second category of complaints consist of challenges on behalf of both candidate Walko and candidate Reed alleging the invalidity of ballots or con-

versely the validity of ballots under the Act of June 3, 1937, P. L. 1333, art. XII, §1223, as amended, 1963, August 13, P. L. 707, §19, 25 P.S. 3063 (Supp. 1974-75). This latter category of complaints will be treated under subheadings depending upon the particular irregularity charged.

At the outset it is important to be reminded that the right of suffrage is the most treasured prerogative of citizenship in this nation and this Commonwealth. It is this right that made the American dream distinctive, where men were to be governed not by the state but by themselves. Unreasonable impairment or unnecessary restrictions upon this right cannot be tolerated whether the contest be for the selection of the President of the United States or the district committeeman.

### Ballots Deposited with Voter Identification Numbers Attached

Section 3055 provides in part: ". . . the election officer shall direct the elector . . . to remove the perforated corner containing the number . . . . Any ballot deposited in a ballot box . . . without having the said number torn off shall be void and shall not be counted." Following this section the Recount Boards in a ruling sustained by the court below refused to count ballots that had been cast where the perforated corner containing identifying numbers had remained attached. There was no direction on the face of the ballot instructing the voter of the need to remove that particular portion before casting the ballot nor is there any evidence on this record that would support a finding that voters who cast the ballots in question were, in fact, advised of this requirement by the appropriate election official. Our research has revealed a dearth of cases for this jurisdiction on the point at issue. We have found only one lower court case addressing an analogous situation, *Mor-*

*ganroth Election Case,* 50 D. & C. 143 (1942). In that instance the election official had given the voter a ballot where the perforated corner had been removed prior to the receipt of the ballot by the voter.

"We are of the opinion that even if the above averment is true we would not be warranted in rejecting this entire vote, thus disfranchising all the citizens who cast their ballots in that district. If the averment is true, the election officer did not perform the duty required by law, but, as pointed out before, it is not alleged that this was done fraudulently or corruptly by the election officer or that the voter had joined in a conspiracy to receive a ballot without the number and, consequently, we regard it as a mere irregularity in the absence of all allegation as to fraud, not affecting the result of the votes cast at this poll, and it has been uniformly held that irregularities will not avoid an election even though the election officers may be subject to punishment." (Citations omitted). 50 D. & C. at 159.

Unquestionably, the preservation of the anonymity of the voter, and the integrity of the vote are legitimate aims for a state to seek to achieve through legislation. Equally as obvious is that this section was designed to permit a citizen to cast his vote in such a manner that he may enjoy complete insulation from untoward influences in the exercise of his judgment. However, while it is most appropriate for the state to legislate to achieve these ends those regulatory measures must not ever be permitted to unduly infringe upon the exercise of the right to vote. Clearly, the invalidation of a ballot where the voter has complied with all instructions communicated to him and in the absence of any evidence of improper influence having been exerted, invalidation would necessarily amount to an unreasonable encroachment upon the franchise and the legislative enactment should not be interpreted to require such a result. To rule otherwise would unnecessarily condition the right

to vote upon the proper discharge of the responsibility of an election official over whom the voter has no control. As suggested by the court *en banc* in *Morganroth,* compliance by an election official with his legislatively mandated duties is better achieved by direct action against the derelict official rather than depriving an innocent citizen of his most precious right.

### Alleged Irregularities on the Face of the Ballot

Candidates Walko and Reed raised challenges to the lower court's ruling contesting the validity of 188 ballots. The alleged defect arises from a failure to comply with the provisions of §3063.[6] Section 3063(a) provides: "(a) No ballot which is so marked as to be capable of identification shall be counted. Any ballot that is marked in blue, black or blue-black ink, in fountain pen or ball point pen, or black lead pencil or indelible pencil, shall be valid and counted: Provided, That all markings on the ballot are made by the same pen or pencil. Any ballot marked by any other mark than an (X) or check (√) in the spaces provided for that purpose shall be void and not counted: Provided, however, That no vote recorded thereon shall be declared void because a cross (X) or check (√) mark thereon is irregular in form. Any erasure, mutilation or defective marking of the straight party column at November elections shall render the entire ballot void, unless the voter has properly indicated his choice for candidates in any office block, in which case the vote or votes for such

---

[6] As has been indicated, 25 P.S. §3063 (Supp. 1974-75), represents the most recent amendment to the Act of June 3, 1937, P. L. 1333, art. XII, §1223. Since the amended portion of the Act was applicable to this election, for purposes of clarity we will refer to Purdon's section number although the amendment itself appears at §19 of the Act of 1963, August 13, P. L. 707.

candidates only shall be counted. Any erasure or mutilation in the vote in any office block shall render void the vote for any candidates in said block, but shall not invalidate the votes cast on the remainder of the ballot, if otherwise properly marked. Any ballot indicating a vote for any person whose name is not printed on the ballot, by writing, stamping or sticker, shall be counted as a vote for such person, if placed in the proper space or spaces provided for that purpose, whether or not an (X) or check ( √ ) is placed after the name of such person: Provided, however, That if such writing, stamping or sticker is placed over the name of a candidate printed on the ballot, it shall render the entire vote in said office block void. If an elector shall mark his ballot for more persons for any office than there are candidates to be voted for for such office, or if, for any reason, it may be impossible to determine his choice for any office, his ballot shall not be counted for such office, but the ballot shall be counted for all offices for which it is properly marked. Ballots not marked, or improperly or defectively marked, so that the whole ballot is void, shall be set aside and shall be preserved with the other ballots. As amended 1963, Aug. 13, P. L. 707, §19, eff. Jan. 1, 1964." As is obvious from the language of the statute the purpose of this section is to prevent a ballot which is marked in a manner capable of identification from being counted. The case law interpreting this section clearly announces a policy to interpret this section to favor enfranchisement rather than disenfranchisement. *Mellody Appeal,* 449 Pa. 386, 391, 296 A.2d 782, 784 (1972); *Wieskerger Appeal,* 447 Pa. 418, 420, 290 A.2d 108, 109 (1972); and *James Appeal,* 377 Pa. 405, 408, 105 A.2d 64, 65-66 (1954).

In *McCaffreys' Appeals,* 337 Pa. 552, 559, 11 A.2d 893, 896 (1940), we stated: "It is manifest from a mere reading of section 1223 of the Act of 1937 that not every mark which may separate and distinguish a ballot will

necessarily result in a declaration of invalidity, but only such marks as cannot be reasonably supposed to have been made by the voter except for the very purpose of distinguishing his ballot, and which are appropriate to that end."

In *Bauman Election Contest Case,* 351 Pa. 451, 454-5, 41 A.2d 630-632 (1945), this Court stated: "Election officers would have enough power to change in many instances the result of an election if they were permitted to throw out every ballot which contained marks which were not contained on any other ballot. The power to throw out a ballot for minor irregularities . . . must be exercised very sparingly and with the idea in mind that . . . an individual voter . . . [is] not to be disfranchised at an election except for compelling reasons.

. . . .

"This Court in its opinion emphasized the fact that 'the purpose in holding elections is to register the actual expression of the electorate's will' and that 'computing judges' should endeavor 'to see what was the true result' ". Further, in the *Bauman* decision, we stated at page 456: "Marking a ballot in voting is a matter not of precision engineering but of an unmistakable registration of the voter's will in substantial conformity to statutory requirements." In a number of decisions following the philosophy announced in *McCaffreys' Appeal, supra* and *Bauman, supra,* this Court has rejected claims of invalidity of a ballot predicated upon minor irregularities where the intention of the voter was clear and there was an absence of any showing that the irregularity was intentionally created specifically to make the ballot identifiable. See, *Mellody Appeal, supra; Wieskerger Appeal, supra; Reading Election Recount Case,* 410 Pa. 62, 188 A.2d 254 (1963); *Norwood Election Contest Case,* 382 Pa. 547, 116 A.2d 552 (1955) and *James Appeal, supra.* An analysis of these cases convinces us that unless the alleged identifying feature

is of such significant proportion that it justifies an inference that it was willfully done for the purpose of rendering the ballot identifiable or where the irregularity has created an ambiguity casting doubt upon the intention of the voter, the irregularity is to be treated as surplusage and the will of the voter must prevail.

We need not attempt to discuss each of the 188 challenges that are here on review. Suffice it to say that this Court has reviewed all of those ballots in question and we will only discuss those where we are in disagreement with the ruling reached below.

### Alleged Improper Mark to Indicate Vote

There are two ballots that fall within this category where we differ with the conclusion reached by the court below. The first ballot, identified in the court below as Exhibit B-Walko, Economy Borough, First District, was not counted by the Recount Board for Walko. That decision was sustained by the court below. Here the voter did comply with the direction that he use either a checkmark or a cross. In this instance, a checkmark was used. The alleged complaint arises from what we believe is an irregularity in the formation of the checkmark which was made to signify the vote for candidate Walko. The Recount Board concluded that, there were three checkmarks in the office block, although a voter was required to vote only for two candidates. An inspection of the ballot shows that this voter in several instances retraced the checkmarks and in some instances the retraced lines did not coincide with the original checkmark. After careful inspection we are satisfied that this was not an attempt to cast votes for each of the three candidates but rather only an attempt to emphasize his mark as was done in several other places on the ballot. Under the expressed provisions of this section an irregularity in the formation of

the check will not provide a basis for invalidating the vote.

The other ballot in this category was identified below as Exhibit A-Walko, Beaver Falls, First Ward. There the only mark on the ballot is the word *yes* in the party column in the space provided for those who wish to cast a straight party vote for the Democratic candidates. In *Reading Election Recount Case, supra,* we held that the word *yes* appearing on a ballot did not render it so unique as to demonstrate a willful intention to make the ballot capable of identification. While that case differs from the instant situation, in that there was also an appropriate mark in the designated block and the word *yes* was treated as surplusage, we do not believe that that difference is material. Just as the proscription against adding unauthorized marks is to preserve the anonymity of the voter, so too is the requirement that a specific type mark be employed to express the voter's intent. To allow additional markings where there is also an appropriate mark and yet not to permit the same additional marking where the intention of the voter is clear by the use of that marking would present an anomaly which would escape rational explanation. Thus, in these two instances we conclude the vote should have been permitted to count for candidate Walko.

### Two Different Writing Utensils Used

In this category there are two ballots. The first was an attempted vote for Walko and identified below as Exhibit A-Walko, Aliquippa Borough, Third District, and the second an attempted vote for Reed, identified as Exhibit A, Chippewa, Second District. In both instances ink and pencil were used. There is nothing distinctive in the manner in which the ballots were marked or in the coloring of the lead and ink that was used. We cannot infer from these ballots that there

was a willful attempt to render them identifiable. We therefore hold that these votes should be counted and thus the total vote credited to each candidate must be increased by one. Cf. *Mellody Appeal, supra* and *Wieskerger Appeal, supra.*

### Erasures and Smudges

There are seven ballots that fall within this category that the court below refused to count. Four of these ballots represent attempts by voters to cast votes for candidate Reed and three of these ballots were intended to be votes for candidate Walko.[7] In several of these instances it is not clear whether, in fact, there was an erasure or whether there was a smudge inadvertently caused in a manner unrelated to an attempt to erase. In *Passante Appeal*, 447 Pa. 304, 309 (1972), we pointed out that we cannot necessarily assume that every smudge was caused by an erasure. Further, none of these questioned marks was sufficiently significant to have set the ballot apart from all others cast in that district and make it capable of later identification. Additionally, there is no question as to the intention of the voter in each of these instances. To deny the vote under these circumstances particularly where the inadequacies of the instructions appearing on the face of the ballot coincide with the reasons for the challenged votes[8] would be without justification.

The lower court's rulings as to these ballots are reversed and candidate Reed is to be credited with an ad-

---

[7] These ballots were identified below as Exhibit D-Reed, Economy Borough, First District; Exhibit B-Reed, Rochester, First Ward; Exhibit A-Reed, Aliquippa, Fourteenth District; Exhibit A-Reed, Pulaski Township; Exhibit B-Walko, Aliquippa, First District; Exhibit A-Walko, Chester, First District; Exhibit A-Walko, Aliquippa, First District.

[8] Here also the printed instructions failed to contain a direction that erasures were not permitted.

ditional four votes and candidate Walko an additional three votes.

### Ballots Found in Spoiled Envelopes and Marked "Void" on the Face of the Ballot

Finally, we reverse the lower court in two ballots, from Beaver Falls, First Ward designated as Reed-Exhibits A & B, which were discovered in the envelope for spoiled ballots and were defaced by the word "void" written along the side of the ballot. Since the spoiled envelope indicates that new ballots were issued, we must conclude under the circumstances that new ballots were, in fact, issued and to avoid a double vote these ballots should not be counted. The court below based its ruling solely on the effect that should be given to the fact that the word "void" appeared on the face of the ballot. We do not believe that this issue can be resolved without also considering the most important fact that the ballots had also been put, apparently by an election official, into the envelope for spoiled ballots. Therefore, it is ordered that these two votes credited to Walko by the court below be hereby subtracted.

### Conclusion

Judge Thomas in his opinion concluded that the final vote of candidate Reed of 30,598 as found by the Recount Board should be increased by twenty votes giving a total of 30,618. Further, he found that the vote of 30,591 certified by the Recount Board for candidate Walko should also be increased by twenty votes bringing his total to 30,611.

We hereby order, for the foregoing reasons, that the total count as found by Judge Thomas for Reed be increased by five votes making a total of 30,623. Likewise, the count for candidate Walko is to be increased

by four votes for a total vote of 30,615. This amended count is to form the basis for the total to be arrived at after the ballots with the perforated corners have been canvassed and tabulated.

Accordingly, the order of the court below is vacated insofar as it is inconsistent with this opinion and the case is remanded for proceedings consistent herewith. The Court below is instructed to supervise the tearing off of the perforated corners to preserve the anonymity of the voters.

DISSENTING OPINION BY MR. CHIEF JUSTICE JONES AND MR. JUSTICE ROBERTS:

We dissent and would affirm the orders of Judge THOMAS.