333 A.2d 902

Appeal of William E. YERGER, Appellant from Order of Court of Common Pleas of Butler County, Pennsylvania.

Petition of VOTERS OF JACKSON TOWNSHIP TO CONTEST NOVEMBER 6, 1973 ELECTION FOR TAX COLLECTOR.

Supreme Court of Pennsylvania.

Argued Oct. 11, 1974.

Decided March 18, 1975.

538

Galbreath, Braham, Gregg, Kirkpatrick, Jaffe & Montgomery, John J. Morgan, Butler, for appellant.

William F. Riesmeyer, III, Coulter, Gilchrist, Dillon & McCandless, Butler, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

This election contest presents the question whether write-in votes may be counted when they are cast on a voting machine for a candidate whose name appears on the face of the machine. The trial court directed that such votes be counted. We reverse.

On November 6, 1973, an election was held to select the Tax Collector of Jackson Township. The result of the official canvass was that William Yerger had received 207 votes and Norman Frederick had received 205 votes. A petition to contest the election was filed by supporters of Frederick, challenging the failure to count eight write-in votes.[1] Appellant Yerger answered that those votes were void because they were cast, in violation of section 1216(e) of the Election Code, on a voting machine for a candidate whose name appeared on the face of the machine.[2]

1. Three of these votes were cast for "Frederick," two for "Norman Frederick," and one each for "Norman E. Frederick," "Normane Frederick," and "Norm Fredick."

2. "A voter may, at any primary or election, vote for any person for any office, for which office his name does not appear upon the voting machine as a candidate, by an irregular ballot containing the name of such person deposited, written or affixed in or upon the appropriate receptacle or device provided in or on

After hearing evidence, the trial court found that Frederick and Yerger were listed on the machine as candidates for tax collector. Above the line on the machine containing the names of Yerger and Frederick as candidates for tax collector was a slide which

"when pushed up enabled a voter to write in a vote for the office of tax collector and when this [slide] was raised, it was no longer possible to register a vote by activating the lever of either of the candidates whose names were printed on the machine . . . because once the write-in [slide] was raised, the only vote that could thereafter be registered on the machine for the office was a write-in vote."

The trial court concluded that section 1216(e)'s command that "no irregular ballot shall be cast on a voting machine for any person . . . whose name appears on the machine as a candidate for that office, and any ballot so cast shall be void" [3] was unconstitutional. It first noted that write-in votes cast on paper ballots on which the name of the same candidate is printed are counted. *James Appeal*, 377 Pa. 405, 105 A.2d 65 (1954). Relying on dictum in *Parente Appeal*, 390 Pa. 249, 253, 135 A.2d 62, 64 (1957), the court held that subjecting write-in votes cast on machines to a different rule violated the command of article VII, section 6 of the

the machine for that purpose, and in no other manner. Where two or more persons are to be elected to the same office, and the name of each candidate is placed upon or adjacent to a separate key, handle, pointer or knob, and the voting machine requires that all irregular ballots voted for that office be deposited, written or affixed in or upon a single receptacle or device, an elector may vote in or by such receptacle or device for one or more persons whose names do not appear upon the machine, with or without the names of one or more persons whose names do so appear. With these exceptions, *no irregular ballot shall be cast on a voting machine for any person for any office, whose name appears on the machine as a candidate for that office, and any ballot so cast shall be void and not counted."* Election Code, Act of June 3, 1937, P.L. 1333, art. XII, § 1216(e), 25 P.S. § 3056(e) (1963) (emphasis added).

3.  See note 2 supra.

Pennsylvania Constitution, P.S., that election laws be uniform.

Because it concluded that the Election Code provision in issue was unconstitutional, the trial court ordered the write-in votes counted and declared Frederick the winner. This appeal ensued.[4]

Before considering the constitutional question decided by the trial court, we must first resolve an issue of statutory construction. On its face, section 1216(e) appears capable of only one construction, for it unambiguously commands that

"no irregular ballot shall be cast on a voting machine for any person for any office, whose name appears on the machine as a candidate for that office, and any ballot so cast shall be void and not counted." [5]

Appellees, however, contend that section 1107(h) of the Election Code,[6] relating to standards required of voting machines, alters the impact of section 1216(e). Section 1107(h) requires that the machine

"permit each voter to change his vote for any candidate . . . up to the time that he begins the final operation to register his vote." [7]

Here there appears to be a conflict between these two sections, for both cannot be given full literal effect on existing voting machines. The trial court found that the machine used in this election does not permit a voter who raises the write-in slide to vote for that office except by write-in. If a voter lifts the slide either by accident

---

4. Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(2), 17 P.S. § 211.202(2) (Supp.1974).

5. See note 2 supra.

6. Election Code, Act of June 3, 1937, P.L. 1333, art. XI, § 1107(h), 25 P.S. § 3007(h) (1963).

7. Id. The Secretary of the Commonwealth is required to certify, using the standards set forth in § 1107, any voting machine before it may be used at any election. Id. § 1106, 25 P.S. § 3006. No claim is made that the machines involved here were not duly certified.

(there were several write-in contests on nearby lines) or intending to cast a write-in vote, he cannot, "before he begins the final operation to register his vote," correct his error or change his mind in order to cast a regular vote for one of the candidates listed on the machine.

It is therefore argued that the apparent conflict should be avoided by construing section 1216(e) to apply only where consistent with section 1107(h). We find this argument without merit.

First, as this Court said in *Cali v. Philadelphia,* 406 Pa. 290, 177 A.2d 824 (1962):

"It is an established principle of . . . construction that, where a conflict exists between a specific . . . provision which is applicable to a particular case and certain general provisions which, were it not for such conflict, might apply, the specific provision will prevail."

Id. at 300, 177 A.2d at 829, quoting *Lennox v. Clark,* 372 Pa. 355, 371, 93 A.2d 834, 841 (1953); Statutory Construction Act, 1 Pa.C.S. § 1933 (Special Pamphlet, 1973). Section 1216(e) deals solely with write-in votes cast on machines, while section 1107(h) relates to the operation of the machine generally. Clearly, the specific language of section 1216(e) cannot be robbed of its effect by the general provisions of section 1107(h).

Second, to construe section 1107(h) as a limitation on section 1216(e) would deprive the latter section of all meaning. As the trial court found in this case, the locking of the regular levers when the write-in slide is raised is necessary

"because if it was possible for a write-in lever to be raised, a write-in vote cast, and then the write-in lever to be lowered and still permit voting for candidates printed on the machine for that office, more than one vote for that office could be registered on the machine

by each voter whereas a voter is permitted only one vote per man to be elected."

Consequently, the feature of the machine causing the apparent conflict is essential to the very operation of voting machines permitting write-in votes and cannot operate to defeat section 1216(e) without making that section entirely inoperative.

■ Moreover, the two sections are capable of a construction which allows both to operate. This can be accomplished by limiting the scope of section 1107(h) to the mechanism involved in casting regular ballots, leaving irregular ballots to be governed by section 1216(e) In the absence of a manifestly contrary intention on the part of the Legislature, such a construction is mandatory. See *Kelly v. Philadelphia*, 382 Pa. 459, 472–73, 115 A.2d 238, 244 (1955); Statutory Construction Act, 1 Pa. C.S. § 1933 (Special Pamphlet, 1973). We therefore conclude that the disputed portion of section 1216(e) is to be given full effect in accordance with its words unless that result is prohibited by the Constitution.[8]

■ The constitutional provision which is said to render section 1216(e) invalid is article VII, section 6 of the Pennsylvania Constitution, which provides, with exceptions not here material, that "[a]ll laws regulating the holding of elections . . . shall be uniform through-

---

8. Nor is this an appropriate case for adopting a less natural construction to avoid a constitutional question. *Curtis v. Loether*, 415 U.S. 189, 192 n. 6, 94 S.Ct. 1005, 1007 n. 6, 39 L.Ed.2d 260 (1974); *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404–05, 28 L.Ed.2d 822 (1971); *Commonwealth v. Dillworth*, 431 Pa. 479, 483, 246 A.2d 859, 861 (1968); *Kurtz v. City of Erie*, 389 Pa. 556, 567–68, 133 A.2d 172, 177 (1957); *Commonwealth v. Saxon*, 219 Pa.Super. 64, 75–76, 275 A.2d 876, 881 (1971); *Doran Investments v. Muhlenberg Township*, 10 Pa. Cmwlth. 143, 148–49 n. 1, 309 A.2d 450, 453 n. 1 (1973). First, as we have just noted, such a construction would utterly defeat the operation of section 1216(e), so that its result is no different from a conclusion that the provision is unconstitutional. Second, the constitutional question is entirely free from difficulty, as will be seen, infra. See *Curtis v. Loether*, supra.

out the State . . .." The claimed lack of uniformity is not geographical, but rather relates to the differing treatment of write-in votes on paper ballots and on machines. A write-in vote cast on a paper ballot for a candidate whose name appears on that ballot will be counted. *James Appeal*, 377 Pa. 405, 105 A.2d 65 (1954). Consequently, it is argued, failure to count such votes cast on voting machines renders the election laws nonuniform, in violation of the Constitution.

This argument misconstrues the nature of the requirement of uniformity. As this Court said in construing the same language in what was then article VIII, section 7 of the Constitution, "To be uniform in the constitutional sense, such a law must treat all persons in the same circumstances alike." *Kerns v. Kane*, 363 Pa. 276, 285, 69 A.2d 388, 393 (1949). But it is only those in "the same circumstances" who must be treated alike; the Legislature is not forbidden to draw distinctions where difference in treatment rests on some substantial basis.

It is easy to find such a basis for the difference in treatment of write-in votes on paper ballots and machines. Allowing write-in votes for those appearing on the machine would increase the time and effort required to count the votes. By ignoring the speedy and efficient means of voting for such candidates provided by the regular operation of the machine, the voter casting an irregular vote would, to that extent, defeat the very purpose of using voting machines. When dealing with a comprehensive and carefully drawn legislative scheme for the conduct of elections, we must take care not to consider the particular elements of the scheme without regard to their place in the entire structure. Otherwise, the legislative plan may be frustrated by deviations, each seemingly reasonable in itself but destructive of the carefully designed structure.

Moreover, we have already noted the danger of double voting which would be created if the use of the write-in

slide did not lock the regular levers. By forbidding write-in votes for candidates appearing on the machine, the Legislature has erected a considerable safeguard against the failure of the locking mechanism. Double voting for the same candidate is thereby entirely precluded. Even when double voting does occur, it will not affect the outcome unless there is a strong write-in candidate, actually competitive with those appearing on the ballot. While such situations are not unknown, see *Weber Appeal*, 399 Pa. 37, 159 A.2d 901 (1960), the more usual contest is between candidates who appear on the ballot (and therefore cannot benefit by double voting even if the locking mechanism fails). Such precautions are unnecessary when dealing with paper ballots, because it is easily determined if any ballot contains more votes for a given office than there are persons to be elected.

"The technicalities of the Election Law (and they are many) are necessary for the preservation of the secrecy and purity of the ballot and must, therefore, be meticulously observed."

*Weber Appeal*, 399 Pa. 37, 44, 159 A.2d 901, 905 (1960).

The primary authority cited for the proposition that distinctions between voting machines and paper ballots violate the uniformity requirement is *Parente Appeal*, 390 Pa. 249, 135 A.2d 62 (1957). In that case it was held that the regulations regarding cumulation of *valid* write-in votes cast under different forms of a candidate's name were no different when the ballots were cast on voting machines than when they were cast on paper ballots. In the course of the opinion, it was said:

"Of course the right of a candidate to cumulation of write-in votes can be no different whether they are written in on voting machines or on paper ballots. Otherwise, there would be a want of the State-wide uniformity which Article VIII, Section 7 of the Penn-

sylvania Constitution requires as to 'All laws regulating the holding of elections . . ..' "
Id. at 253, 135 A.2d at 64.

It must first be noted that the quoted passage from *Parente Appeal* was necessarily dictum, as the issue was resolved by statutory construction. More importantly, once it has been ascertained that a ballot was validly cast, the issue of how to count the ballot is one of the intention of the voter. *McCracken Appeal*, 370 Pa. 562, 88 A.2d 787 (1952). There is no reason why the process of determining this intent should differ according to whether the vote was cast on a voting machine or a paper ballot. Thus, *Parente Appeal* is readily distinguished from this case, where the question involves the validity of the ballot, which may turn on differences in the susceptibility of the two modes of voting to particular abuses. The Legislature has found the difference material here and we cannot say that it was without basis for doing so.

The order of the court of common pleas declaring Norman E. Frederick the winner of the election for Tax Collector of Jackson Township is reversed.

MANDERINO, J., joins in this opinion and filed a concurring opinion.

NIX, J., filed a dissenting opinion.

MANDERINO, Justice (concurring).

I join in the majority opinion by Mr. Justice Roberts. I should like to add a word about section 1107(h) of the Election Code. That section requires that the voting machine "permit each voter to change his vote for any candidate . . . up to the time he begins the final operation to register his vote."

If a voter moves a lever next to the name of a candidate listed on the voting machine and then changes his mind and moves the lever back to its original position, it

is certain, unless the machine is malfunctioning, that the movement of the lever and the subsequent return of the lever to its original position *did not* cause any vote to be *registered*.

On the other hand, once a voter moves the slide next to the write-in slot, *it is not certain* and it cannot be known whether that voter *registered* a vote.

Section 1107(h) applies *up to the time* that the voter begins *the final operation to* register his vote. In the case of the lever next to a listed candidate's name, we are *certain* that the *final operation* did not begin. In the case of the slide next to the write-in slot, we are *not certain* whether or not the final operation began. Thus, there is no conflict between section 1107(h) and section 1216(e). The voter, so far as can be known, "begins the final operation to register his vote" when he moves the slide next to the write-in slot.

NIX, Justice (dissenting).

Today a majority of this Court reverses the certification by the trial court of Norman E. Frederick as Tax Collector of Jackson Township, Pennsylvania. In doing so the majority ignores the clear intention of the voters of Jackson Township and unseats an elected official who has been serving as Tax Collector for over one year. I respectfully dissent.

The controversy centers upon eight write-in votes for Mr. Frederick which the majority concluded should not be counted in view of section 1216(e) of the Election Code, Act of June 3, 1937, P.L. 1333, art. XII, § 1216(e), 25 P.S. § 3056(e) (1963).

The majority analysis, however, ignores basic concepts which this Court has followed in construing election laws. In *Melody Appeals*, 449 Pa. 386, 296 A.2d 782

(1972), we quoted from *Weiskerger Appeal,* 447 Pa. 418, 420, 290 A.2d 108 (1972) as follows:

" 'As stated in the Reading Election Recount Case, 410 Pa. 62, 188 A.2d 254 (1963): "the power to throw out a ballot for minor irregularities should be sparingly used. It should be done only for very compelling reasons. . . . 'Marking a ballot in voting is a matter not of precision engineering but of an unmistakable registration of the voter's will in substantial conformity to statutory requirement.' " In construing election laws while we must strictly enforce all provisions to prevent fraud our overriding concern at all times must be to be flexible in order to favor the right to vote. Our goal must be to enfranchise and not to disenfranchise [citing a case].' " 449 Pa. at 391, 296 A.2d at 784.

In *In Re: Recount of Ballots,* 457 Pa. 279, 325 A.2d 303 (1974), we said:

"At the outset it is important to be reminded that the right of suffrage is the most treasured prerogative of citizenship in this nation and this Commonwealth. It is this right that made the American dream distinctive, where men were to be governed not by the state but by themselves. Unreasonable impairment or unnecessary restrictions upon this right cannot be tolerated whether the contest be for the selection of the President of the United States or the district committeeman." Id. at 287, 325 A.2d at 308.

The majority, ostensibly to insure added protection against double voting and an efficient machine voting operation, disregards the manifest intent of eight voters in an election where the margin of difference was only two votes.

If the excerpts quoted above mean anything, they at least stand for the proposition that voter intent should override the "efficiency" of machine voting. Moreover, double voting is amply prevented by the locking mecha-

nism of the machine whereby once the lever is depressed the write-in slide will not operate. Should the person first use the write-in slide, then the lever will not operate. Thus, there is no reason to cancel these votes, especially where there is no evidence of fraud, nor any evidence that write-in votes plus lever votes amounted to a greater number of votes than there were voters.

The mechanism of the machine operates so that a person who opens the slide and then wishes to vote for a listed candidate can do so *only* by writing in that name. To disenfranchise that voter merely for changing his mind is clearly contrary to the admonition in *Melody Appeals, supra*, that "our overriding concern at all times must be to be flexible in order to favor the right to vote." I can find no distinction between the instant situation and clear erasures which we permitted in *In Re: Recount of Ballots, supra*, in the face of a contrary statutory provision, Act of June 3, 1937, P.L. 1333, art. XII, § 1223, as amended, Act of August 13, 1963, P.L. 707, § 19, 25 P.S. § 3063.

Most importantly, where it is clear that the voter was not expressly instructed that his write-in vote for a listed candidate would not be counted and the voter would not otherwise reasonably question the integrity of his vote, invalidation should not occur. In *In Re: Recount of Ballots, supra*, we said at 287–88, 325 A.2d at 308:

"There was no direction on the face of the ballot instructing the voter of the need to remove that particular portion before casting the ballot nor is there any evidence on this record that would support a finding that voters who cast the ballots in question were, in fact, advised of this requirement by the appropriate election official . . .

[W]hile it is most appropriate for the state to legislate to achieve these ends those regulatory measures must not ever be permitted to unduly infringe upon the exercise of the right to vote. Clearly, . . . where the voter has

complied with all instructions communicated to him and in the absence of any evidence of improper influence having been exerted, invalidation would necessarily amount to an unreasonable encroachment upon the franchise and the legislative enactment should not be interpreted to require such a result."

We continued:

"To deny the vote under these circumstances particularly where the inadequacies of the instructions appearing on the face of the ballot coincide with the reasons for the challenged votes would be without justification". *Id.* at 294, 325 A.2d at 312. (Footnote omitted).

In this case, not only was there a lack of proper instructions, but because this was the first time voting machines were used in this district, a state of confusion among the voters on election day was amply shown on the record during the questioning of a judge of elections:

"Q. I see. Will you tell us some of your experiences on this day in regard to the use of the machines and the explanations given?

A. Well, it was mass confusion, I guess you would call it. It was the first time the machines had ever been used, and they combined two districts, Jackson east and Jackson west after the primaries were held, and they said when they were, combined them they would give us three machines, and on election day we had two machines, and so many people came to vote, no one had used the machines, and they didn't understand them and we were to explain how to use them before everyone went into the machine, and that took an awful lot of time, and there was so many voters that didn't come. Well, between five and, or even say between six and eight we had more voters in those two hours than we had the whole day, and there were so many people lined up at eight o'clock, then, we closed the doors. It took us to nine:thirty before we got the

last person voted. That's how many were waiting to vote, and a lot of them got disgusted and some people complained they had waited two hours to vote.

Q. Mrs. Brandon, did you have questions during the day as to how to make write-in votes?

A. No. We tried to explain to them before then went in to vote, but on the sample little machine they give us to demonstrate, the keys for the printed ballots was there but it didn't have a, those, like those little slots for the write-ins and we told them they were above the keys and to slide the slot up, you know, to write in."

In my judgment the proper rule to be followed where there is no finding of fraud or improper influence is that the voter will not be disenfranchised unless his vote is unclear, or he knew, or should have known, or was expressly told that the method of voting which he employed would invalidate his vote.

I would affirm the order of the court below.