Alexander F. Barbieri, Court Administrator of Pennsylvania, Petitioner *v.* Richard L. Thornburgh, Governor of the Commonwealth of Pennsylvania; Ethel D. Allen, Sectretary of the Commonwealth of Pennsylvania; Louis C. Mete, Commissioner of the Bureau of Elections, Commissions and Legislations for the Commonwealth of Pennsylvania, Respondents.

2

[REDACTED]

Argued March 20, 1979, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, ROGERS and BLATT. Judges DISALLE, CRAIG and MACPHAIL did not participate.

*Jonathan Vipond, III*, with him *Kathleen M. Quinn*, for petitioner.

*Robert E. Kelly,* Deputy Attorney General, for defendant.

OPINION BY PRESIDENT JUDGE BOWMAN, April 12, 1979:

By a petition for declaratory judgment filed February 22, 1979, which we regard and act upon as a petition for review in the nature of declaratory judgment, Pa. R.A.P. 1501, 1503, the Court Administrator of Pennsylvania asserts that a question has been raised as to when vacancies which will occur at the end of the elective terms of office of Chief Justice MICHAEL J. EAGEN and Associate Justice HENRY X. O'BRIEN are to be filled, which in turn, depending upon resolution of this issue, brings into issue the appointive power of the Governor.

As our original jurisdiction is being invoked pursuant to Section 761, Judicial Code, 42 Pa.C.S. §761, in an action or proceedings against Commonwealth officials,[1] there must be a governmental determination to support the cause of action asserted, Pa. R.A.P. 102, 1502. We perceive no governmental determination whatsoever either in the form of action or nonaction with respect to the vacancy which will occur upon the expiration of the elective term of office of Associate Justice O'BRIEN on the first Monday of January, 1983. We, therefore, decline to entertain the petition for review insofar as it attempts to invoke our original jurisdiction as to the election of his successor. However, we perceive a governmental determination to have been made as to the election of a successor to the Chief Justice whose elective term of office expires on the first

---

[1] The Governor, the Secretary of the Commonwealth and the Commissioner of the Bureau of Elections, Department of State, are the named respondents. Collectively they are responsible for the certification of public offices to be filled by the election process.

Monday of January, 1981, such determination being that of not certifying the election of his successor as one to be conducted during the municipal election year 1979, which is one of the four alternative solutions proffered by the Court Administrator to the issue raised.[2]

The facts are relatively simple and undisputed but to juxtapose them within the framework of our present Constitution with their origin being embedded in our Constitution of 1874 is, indeed, an elusive task.

In the year 1959, the Chief Justice was elected to the Supreme Court of Pennsylvania and duly commissioned to serve a twenty-one year term of office expiring the first Monday of January, 1981. Article V, Section 2, Constitution of 1874. At that time and until adoption of the Constitution of 1968, the Judiciary Article did not address the question of whether justices and judges elected by the electors of the State at large were to be elected in general election (even-numbered) years or municipal election (odd-numbered) years. Article VII, Section 3, provided that "[a]ll judges elected by the electors of the State at large may be elected at either a general or municipal election, as circumstances may require" and this same provision continues today in this article. However, substantial changes were made to Article V, The Judiciary, by the Constitution of 1968. Bearing upon the issues raised are the following provisions found in this Article:

§13. Election of justices, judges and justices of the peace; vacancies.

---

[2] In *Thiemann v. Thornburgh*, No. 592 C.D. 1979, a companion case, the same issue is raised as to the election of a successor to the Chief Justice upon expiration of his elected term of office, in which petitioner contends the Constitution requires this result and seeks appropriate relief consistent with the conduct of an election in this municipal election year 1979.

(a) Justices, judges and justices of the peace shall be elected at the municipal election next preceding the commencement of their respective terms of office by the electors of the Commonwealth or the respective districts in which they are to serve.

(b) A vacancy in the office of justice, judge or justice of the peace shall be filled by appointment by the Governor. The appointment shall be with the advice and consent of two-thirds of the members elected to the Senate, except in the case of justices of the peace which shall be by a majority. The person so appointed shall serve for an initial term ending on the first Monday of January following the next municipal election more than ten months after the vacancy occurs.

. . . .

§15. Tenure of justices, judges and justices of the peace.

(a) The regular term of office of justices and judges shall be ten years. . . .

Recognizing that general election years remain constitutionally mandated as the even-numbered years and municipal election years as the odd-numbered years, the Court Administrator citing the mentioned constitutional provisions poses four possible solutions but has declined to take a position as to which possibility constitutes the proper interpretation of the Constitution of 1968.[3] In his petition for review, the possibilities are said to be:

---

[3] This posture should and normally would compel us to conclude the want of a case or controversy in declaratory judgment producing rather an advisory opinion notwithstanding the recent liberal view as to declaratory judgment actions expressed in *Friestad v. Travelers Indemnity Co.*, 452 Pa. 417, 306 A.2d 295 (1973). *See also* Section 7531 et seq., Judicial Code 42 Pa.C.S. §7531 et seq., incorporating the

(1)  Election in 1979 with the winner to take office in 1981;

(2)  Election in 1980 with the winner to take office in 1981;

(3)  Election in 1981 with the Chief Justice to hold over for a year;

(4)  Election in 1981 with the Governor's appointee filling the gap in that election year.

We have no difficulty in rejecting possibilities (2) and (3) as posed by the Court Administrator as being contrary to prior case law addressing these constitutional provisions, albeit in other contexts.

### Alternate 2

To elect a successor to the Chief Justice in the general election year 1980 with the successful candidate assuming office on the first Monday of January, 1981 —the date of the expiration of the elective term of office of the Chief Justice—not only seems counter to the clear and specific provision of Section 13(a), Article V, that judges shall be elected in municipal election years, but would also perpetuate a disavowal of this provision into the future as Justices now are elected to ten year terms. Section 15(a), Article V. It must also be noted that in *Barbieri v. Shapp,* 470 Pa. 463, 368 A.2d 721 (1977), former Chief Justice JONES (plurality opinion) concluded that Section 13(a), Article V, providing that justices and judges shall be elected in municipal election years supersedes and prevails over the provisions of Section 3, Article VII, authorizing such elections in municipal or general election years as the circumstances may require.

---

Declaratory Judgments Act into the Judicial Code. However, the companion case of *Thiemann v. Thornburgh, supra* note 2, does posture a controversy which affords at least a tenuous reason to resolve the issues posed in this proceedings.

### Alternate 3

Similarly, to elect a successor to the Chief Justice in the municipal election year 1981 with the successful candidate assuming office on the first Monday of January, 1982, but with the Chief Justice holding over until that latter date is equally unsupportable. It is contrary to a long-standing principle that a court is without power to extend constitutionally fixed terms of judicial office, however appealing the power to do so might appear under extenuating circumstances. *Barbieri v. Shapp, supra.*

The present Chief Justice when elected under the provisions of the Constitution of 1874, was afforded a single twenty-one year term. Such terms of office are now fixed at ten years. To extend his term of office to one. of twenty-two years simply to solve a problem would be judicial usurpation of power without constitutional support such as was found in *Barbieri v. Shapp, supra,* with respect to transitional problems created as to Superior Court judges and at least recognized and addressed in the Schedule to the Judiciary Article of the 1968 Constitution. *See also Commonwealth ex rel. Barratt v. McAfee,* 232 Pa. 36, 81 A. 85 (1911).

### Alternates 1 & 4

The remaining two alternatives each find some support in the competitory concerns expressed in our decisional law and in literal application of at least some of the cited constitutional provisions to their respective factual matrices. We are persuaded that the fourth alternative proposed by the Court Administrator represents the favorable balance of these concerns and does not do violence to the Constitution and is a pragmatic solution to a problem which the drafters of the Constitution of 1968 neither addressed nor contemplated and which makes a search for their intent

and that of the electorate in adopting the 1968 Constitution not only elusive but futile.

Both remaining alternative solutions meet the explicit constitutional mandate that the election of justices shall be held in municipal election (odd-numbered) years.

The first alternative—that of electing in 1979 a successor to the Chief Justice who would assume office on the first Monday of January, 1981—would also appear to meet the requirement that such election be held in the municipal election year "next preceding the commencement" of his term of office. It necessarily produces however, an interval of more than a year between his election and the assumption of office, which runs contrary to a public policy concern that such long intervals should be avoided. In *Barbieri v. Shapp, supra,* the issue was when Judge CERCONE of the Superior Court should run for reelection. Judge CERCONE's original ten year term was to expire in January, 1979. However, the 1968 amendments to the Constitution specified that judges are to be elected in municipal elections (odd-numbered years). In that case, the election could have been in 1977 or in 1979.

The Court rejected as untenable the argument that Judge CERCONE should run in the 1977 municipal election. The Court stated that such a timetable would result in a fourteen month interval between the election and the assumption of office. This, the Court ruled, was against public policy. Moreover, the Court noted such a situation would result in a perpetual fourteen month interval between election and the assumption of office.

The same policy concern applies here and should be avoided where an alternative solution exists. On the other hand, the fourth alternative—that of electing in 1981 a successor to the Chief Justice who would assume office on the first Monday of January, 1982, liter-

ally meets the mandate of Section 13(a), Article V, would solve the problem for the future, would normalize the time span between one's election and the assumption of office, and would synchronize such election within the general framework of the election of all judges as set forth in Article V.

The only expressed constitutional or policy concern contrary to this alternative is that of favoring the election of judges over their appointment. *Barbieri v. Shapp,* 476 Pa. 513, 383 A.2d 218 (1978). This fourth alternative necessarily invokes the application of the appointive power of the Governor, whereas the first alternative does not. However, the Constitution of 1968 recognizes that vacancies in judicial office will occur under circumstances in which the election process must necessarily be conducted at some future time. In such cases, it cannot be said that the Constitution is any less expressive of the Governor's appointive power or that it expresses a preference of the election process over the appointive power. To the contrary, its intent, under such circumstances, is as express as is its intent to utilize the election process. We are of the opinion that the Governor's appointive power is operative and properly applied in solution of the issue before us in that the term of office of the Chief Justice will expire on the first Monday of January, 1981, creating a vacancy at that time with the election process operative in that year to elect his successor. *See Berardocco v. Colden,* 469 Pa. 452, 366 A.2d 574 (1976).

Considering the conflicting public policy concerns confronting us in these two alternatives as expressed in case law and the relevant constitutional provisions, we concluded the fourth alternative should prevail. It avoids a long interval between the election of a successor and his assumption of office, it provides a permanent solution to the unique problem posed, it synchronizes the election of all justices, and while recog-

nizing and allowing for exercise of the appointive power of the Governor, does so without frustration of the election process which will occur in the same year in which the appointive power would come into play.

Accordingly, we issued our Order of March 26, 1979, with Judge CRUMLISH, JR. dissenting.

PER CURIAM ORDER

Now, March 26, 1979, it is hereby declared to be and it is the judgment of the Court that the vacancy which will occur on the first Monday of January, 1981, resulting from the expiration of the term of office of Chief Justice MICHAEL J. EAGEN, shall be filled by the election process in the municipal election year 1981 with his elected successor in office to commence his term of office on the first Monday of January, 1982; the interim vacancy to be filled by appointment by the Governor for an appointive term ending the first Monday of January, 1982.

***

DISSENTING OPINION BY JUDGE CRUMLISH, JR.:

Believing that this dissent disposes of the issues in both the *Barbieri* and *Thiemann* petitions, I consider this opinion to control and incorporate both petitions by reference herein.

I view the narrow issue in this case to be: Do the Constitution and Election Code[1] prescribe the method and timing of the selection of a successor to the incumbent Chief Justice when the vacancy occurs as a result of the expiration of his elected term on the first Monday of January, 1981?

Article V, Section 13(a), clearly mandates the *election* of a successor to the incumbent Chief Justice at

---

[1] The Pennsylvania Election Code, Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §2601 et seq.

the Municipal Election, 1979, which next precedes the commencement of the elected Justice's term in January, 1981.

The judiciary may not, in expounding its individual or collective preference for judicial selection, ignore the clear determination of the electorate that in these unique circumstances election is the only appropriate course.[2]

The majority, in citing *Commonwealth ex rel. Barratt v. McAfee,* 232 Pa. 36, 81 A. 85 (1911), proposes the notion that a 14-month hiatus[3] between a judge's election and installation is so undesirable that a gubernatorial appointment is preferable.[4]

However, as I read our Supreme Court's recent decisions, public policy as expressed by the electorate is indubitable. The existence of a strong public sentiment favoring the election of the judiciary cannot now be rationally disputed. *See Barbieri v. Shapp,* 476 Pa. 513, 383 A.2d 218 (1978); *Leedom v. Thomas,* 473 Pa.

---

[2] An alternative method of judicial selection by which members of the judiciary would be appointed by the Governor from a list of qualified persons submitted to him by the Judicial Qualifications Commission was rejected by the electorate at the Primary Election in May, 1969.

[3] The term "hiatus" is defined by Webster's Third New International Dictionary (1966) as a "lapse" or "interruption" and, as used in the majority opinion and my dissent, refers only to the interim between the Judge's election and installation. Barring the unforeseen, there will not be a vacancy on the Supreme Court bench occasioned by this hiatus.

[4] The majority also cites *Barbieri v. Shapp,* 470 Pa. 463, 368 A.2d 721 (1977). However, the *Barbieri* case, *supra,* although noting policy considerations contrary to a hiatus between election and commencement of office, is inapposite to the case at bar. The issue was whether a Superior Court Judge's term should be extended so as to avoid a 14-month hiatus between election and commencement of term. An express provision of the Constitution, Article V, Schedule Section 2, authorized the adjustment of judicial terms of Superior Court Judges and dictated the result reached by our Supreme Court.

193, 373 A.2d 1329 (1977); *Berardocco v. Colden,* 469 Pa. 452, 366 A.2d 574 (1976).

Section 13(b.) does confer gubernatorial appointment power in certain circumstances but, unhappily for the majority position, they are absent in the case before us.

Gubernatorial appointment power cannot supersede the constitutional dictate which provides that in circumstances such, as here, where the vacancy is *anticipated*: "election is the prescribed method of filling judgeships in Pennsylvania. The appointment procedure of Section 13(b) is a stopgap to fill seats that *unexpectedly* fall vacant." *Berardocco v. Colden,* 469 Pa. at 459, 366 A.2d at 577. (Emphasis added.)

Public policy which heretofore may have militated against a hiatus, if one exists, between election and installation, must show deference to clear constitutional language just as the common law must subordinate itself to written statutes.[5]

Our Supreme Court has emphasized the constitutional urgency of judicial elections and has declared that they must be held whenever possible. *Barbieri v.*

---

[5] The majority appears to me to overlook the obvious benefits to be enjoyed by the Justice-elect and the people of this Commonwealth during the gestation period of election and installation. A few occur to me: the retiring Justice will continue to provide his wisdom, experience and fidelity as he would be anticipating retirement at age 70; he could, with the other members of the Court, counsel his successor and prepare him to accede more fully equipped to discharge his responsibilities than with a purely academic background.

The Justice-elect would then, with greater assurance than one who has been nominated by the Governor and awaits delayed or controversial confirmation by the Senate, satisfactorily close out his private practice so that clients have received optimum professional attention. At the same time, he would have ample time to prepare for the extraordinary leap from bar to bench.

None of these considerations is novel. It is commonplace in "lame duck" situations involving elected government officials at the federal, state and municipal levels.

*Shapp, supra; Berardocco v. Colden, supra.* But, of course, an election is an empty ritual unless a meaningful opportunity is given to candidates to present themselves to the electorate for nomination *and* election.

Does the Election Code's calendar of events preceding the nomination of candidates compel such rigid adherence so as to effectively nullify the mandate I see in Section 13(a)?

The Constitution itself provides little guidance in the manner of conducting elections; the Election Code sets forth a step-by-step process to be followed by candidates seeking nomination by political bodies or parties. The deadline for each event is calculated with reference to the fixed primary date. However, in our case, the Code's deadline for the filing of nomination petitions and papers by participants in the Municipal Primary scheduled for May, 1979, has been reached.

It is pedantic indeed to observe that the Constitution is the supreme law of this Commonwealth and that provisions of the Election Code are valid only if they insure the constitutional right of suffrage.[6]

The Election Code and the rule that its provisions must be meticulously observed[7] are not abrogated by meshing into our pronounced constitutional framework the designation of special ad hoc nomination proced-

---

[6] Our Supreme Court wrote in *In Re: Recount of Ballots*, 457 Pa. 279, 287, 325 A.2d 303, 308 (1974) :

At the outset it is important to be reminded that the right of suffrage is the most treasured prerogative of citizenship in this nation and this Commonwealth. It is the right that made the American dream distinctive, where men were to be governed not by the state but by themselves. Unreasonable impairment or unnecessary restrictions upon this right cannot be tolerated whether the contest be for the selection of the President of the United States or the district committeeman.

[7] *See In Re: Election of Supervisor in Springfield Township, Mercer County*, 399 Pa. 37, 159 A.2d 901 (1960).

ures. This, in my judgment, is a wholly acceptable pragmatic solution to the facial dilemma posed by the majority when it attempts to substitute judicial appointments to expected vacancies for the constitutionally expressed preference for judicial elections.

Accordingly, I would grant the relief requested by Petitioner Thiemann and order that nomination papers and petitions filed within two weeks hence be deemed timely filed, allow for the withdrawal of candidates within two days of filing and allow four days from the date nomination papers and petitions are received and filed for the allowance of objections thereto. I would require the ballot to clearly set forth which candidates sought nomination for the 10-year term of office on the Supreme Court of Pennsylvania to commence on the first Monday of January, 1981. In all other respects, the procedures for nomination papers and petitions would conform to the stated Election Code requirements.

Should, and so it would appear at this writing, the passage of time prohibit the perfection of this timetable, I would order Respondents to issue a writ of election, setting a date for a special limited primary to be conducted solely for the purpose of selecting candidates, one of whom is to be elected to the Supreme Court in the November Municipal Election to take office upon the expiration of the incumbent Chief Justice's term. The nomination procedures recited herein would conform to the requirements of Article IX of the Election Code, although calculated to the fixed primary date.

I propose a satisfactory alternative by setting the first Tuesday following the second Monday of September as the special primary election date.[8] This would

---

[8] Thus, the procedure for the special limited primary would involve the following deadlines, *inter alia*:

allow ample time for an effective campaign for nomination and general election. A brief campaign period has the advantages of ameliorating the uniquely frustrating restraints imposed on judicial campaigns, *see* Melone, *Political Realities and Democratic Ideals: Accession and Competition in a State Judicial System,* 54 North Dakota L. Rev. 187 (1977); Spaeth, *Reflections on the Judicial Campaign,* 60 Judicature 10 (1967), and would familiarize the electorate with the candidates' qualifications. Candidates and the voters would be spared the heavy toll of time, energy, money and patience exacted by protracted campaigns whose antique origins were born in the early vastness of this continent and the then-existing communication and transportation frailties which obviously are now inapplicable.

The paramountcy is that either of these alternatives would allow candidates of political parties and bodies meaningful access to the ballot and thus fullfill the thoughtful constitutional directive of Article V, Section 13(a).

Any practical difficulties encountered in effecting the constitutional scheme for an elected judiciary are insignificant when one considers the potential violence to our constitutional framework:

We have no right to disregard or (unintentionally) erode or distort any provision of the Constitution, especially where, as here, its plain

---

(1) sending, no later than June 12, 1979, written notification from the Secretary of the Commonwealth to the County Board of Elections designating the anticipated vacancy on the Supreme Court bench for which candidates are to be nominated at the primary;

(2) publication of the primary election proclamation by the County Board of Elections between the 12th and 11th week before September 11, 1979;

(3) filing of nomination petitions by July 3, 1979; and

(4) filing of nomination papers by July 25, 1979.

and simple language makes its meaning unmistakably clear; indeed, because of the times in which we live we have a higher duty than ever before to zealously protect and safeguard the Constitution.

*Commonwealth v. Russo,* 388 Pa. 462, 471, 131 A.2d 83, 88 (1957).

*See also Breslow v. Baldwin Township School District,* 408 Pa. 121, 182 A.2d 501 (1962).

Our Supreme Court instructs that elections be conducted whenever possible to fill expected judicial vacancies. Such an election process is available and workable. Gubernatorial appointment power to fill unexpected vacancies is neither ignored nor destroyed by my views.

I conclude that the election of a successor to the incumbent Chief Justice in the Municipal Election of November, 1979, is constitutionally required and appropriate election machinery is available for that purpose.