McNULTY AND ELKSNIS *v.* BOARD OF SUPER-
VISORS OF ELECTIONS FOR ANNE
ARUNDEL COUNTY, ET AL.

[No. 451, September Term, 1966.]

*Decided per curiam October 20, 1966.*

*Opinion filed December 13, 1966.*

The cause was argued before the entire Court.

*William J. McCarthy,* with whom were *Joseph H. H. Kaplan* and *Venable, Baetjer & Howard* on the brief for appellants.

*John A. Blondell,* for Board of Supervisors of Elections for Anne Arundel County, part of appellees; *Louis M. Strauss,* with whom was *Robert A. Dietz,* on the brief, for Theodore L. Bertier, Jr., other appellee.

FINAN, J., delivered the opinion of the Court.

After oral arguments, we affirmed by per curiam order dated October 20, 1966, the order of the Circuit Court for Anne

Arundel County which dismissed appellants' petition for a Writ of Mandamus. Our reasons for affirmance follow.

The appellant, Honorable John F. McNulty (hereinafter referred as to McNulty) for some years a member of the General Assembly of Maryland and a candidate for the office of State Senator, in the September 13, 1966 Democratic Primary, petitioned the Circuit Court for Anne Arundel County for a Writ of Mandamus to be directed to the appellees, Board of Supervisors of Elections of that County (hereinafter referred to as the Board), to require them to award to him 136 disputed votes cast in the primary and to declare and certify him as the democratic nominee for the office of State Senator from Election District 6A of that County. From the lower court's (Sachse & Childs, JJ.) dismissal of the petition for mandamus this appeal was taken.

McNulty was one of four candidates running for the Democratic nomination for State Senator from Legislative District 6A. The names of the candidates for that office were arranged in alphabetical order in column seven (7) on the ballot. Thus on line A of column 7 appeared the name of candidate Bertier, on line B candidate Boyd, on line C candidate Clark and on line D candidate McNulty. Line E, column 7, was left blank. Line E ran across the face of the machine under the columns for all offices and the majority of all blocks in that line, including that portion of line E under the State Senatorial candidate column were left blank. Line E was the last line devoted to democratic candidates. Since Republican levers, below line E on the voting machines were all locked by an attendant when a democrat entered the booth, line E was the "bottom line" for a democratic voter.

To better visualize the situation we have reproduced column 7 as it appeared on the ballot.

**7**
**For**
**State**
**Senator**
**(Vote for One)**

**7 A**

DEMOCRATIC
THEODORE L.
**Bertier,**
JR.

**7 B**

DEMOCRATIC
RALPH C.
**Boyd**

**7 C**

DEMOCRATIC
J. NELSON
**Clark**

**7 D**

DEMOCRATIC
JOHN F.
**McNulty**

**7 E**

Although it is the established practice for blank spaces on voting machines to be covered by metal plates, spaces in line

7E, which were the blocks immediately below the name of Mc-Nulty, were left uncovered or "open" on 39 of the 49 voting machines used in District 6A. Failure to cover these spaces was allegedly due to a shortage of covers. There was testimony that the Board did not know of the shortage of covers until the day after the election and that had they known of this shortage they would have made arrangements to borrow additional covers from another County. The Chairman of the Board testified that in his opinion all the levers should have been locked and that the available supply of covers could have been better arranged on the machines.[1]

It is uncontradicted that McNulty's campaign slogan called for the voters to "vote the bottom line." Since line E was left open it became the bottom line and the 136 votes in dispute are the ones which were cast in block 7E, the blank space directly below McNulty's name (block 7D). It is also uncontroverted that McNulty's campaign manager mailed 15,000 sample ballots showing McNulty's lever number as 7D; that voting instructions, published in two weekly papers on the Thursday prior to the election and in a daily paper on the Monday preceding the election, specifically told the voters to turn down the pointer over the candidate's name for whom they wanted to vote; that specimen ballots contained these same instructions; that voting directions prepared by the Attorney General, containing the specific instruction to pull down the lever over the candidate's name were posted on all but three voting machines; and that when a voting lever was pulled a white 'x' appeared over the name of the candidate directly below the lever. Models of a voting machine, showing a portion of the machine's face, were also available in each polling place for the voters' inspection.

The results of the election showed McNulty (1964 votes)

---

1. It should be noted that there is nothing in Art. 33, sec. 119, *et seq.,* Code (1957 Ed. and 1965 Supp.) (Election Laws), which places a specific legal obligation on the Board to lock or cover any levers which are not to be made available for use in voting for a candidate. It is the practice, however, to do so, and one cannot gainsay the utmost desirability of such a practice, if the Board is to diligently pursue its obligation to conduct fair elections.

ran second to candidate Bertier (2016 votes). On the 39 machines, on which the E line had been left open, 136 votes had been cast in space 7E. From these figures candidate Bertier was declared the winner. McNulty requested that the Board of Canvassers award the 136 votes cast in space 7E to him. After a canvass was made, McNulty requested a recount on the premise that the votes cast in 7E were intended for 7D and therefore should have been awarded to him. A recount, at which McNulty was present, was had on 27 September 1966 and on the same day a hearing was held at the office of the appellees. At this hearing appellant was represented by counsel, who had an opportunity to argue why appellant's request for the 136 disputed votes should be granted. McNulty produced no witnesses, although he was given the opportunity to do so. After listening to the arguments of all interested parties, the appellees refused to award the 136 votes to McNulty saying:

> "The Board unanimously feels that the intent of the voter was probably to cast their vote for Mr. McNulty and other candidates on the D Line, when instead they, in error, pulled the lever for the E Line. We feel sympathetic to these candidates; however our counsel, John Blondell, had advised us there is no legal justification for awarding these votes to them, in the absence of evidence showing that levers over the candidates names could not be pulled."

After the appellees certified Mr. Bertier as the winning candidate, McNulty petitioned the lower court for a Writ of Mandamus. Candidate Bertier was allowed to intervene in the action as an interested party. Demurrers and answers were filed by appellees and the intervenor. At the hearing on the petition for Mandamus, appellant Elksnis testified that notwithstanding the fact that he had taken a sample ballot card, given out by McNulty, into the voting booth with him when he voted, he cast his vote beneath McNulty's name (7E) because he had been told at various political rallies, "Don't forget to vote the bottom line, don't forget the bottom line, Mr. Wagner and Mr. McNulty," and that since line E column 7 "was unlocked, * * * I thought I was voting right and I pushed it [lever 7E]

down." However, Elksnis admitted that there was nothing to have prevented him from pulling down lever 7D, as the instructions on McNulty's sample ballot card so advised.

McNulty argued that the obvious intention of the 136 voters who had cast votes in block 7E was to vote for him and that since the appellees had found that this was "probably" their intention, these 136 votes should be awarded to him and he should have been certified as the winner of the Democratic nomination for State Senator from Election District 6A of Anne Arundel County.

Elksnis contended that if the votes cast in space 7E were not awarded to McNulty, he and 135 other voters would thereby be disenfranchised, in violation of the law and the Constitution of the United States. It should be noted that, even though line E was left unlocked, or "open," only 1 vote could be cast in column 7, thus there was no possibility of 1 person voting twice for a State Senatorial candidate (column 7).

Holding that the judicial process does not extend to guessing what a voter intended to do or for whom he intended to vote, and finding no fraud or arbitrary conduct on the part of the appellees, the lower court dismissed the petition for a Writ of Mandamus.

For many years this Court has held that the actions of a Board of Supervisors of Elections in the absence of fraud are reviewable on mandamus only in the event that such conduct is capricious or arbitrary, although it is also now well settled that an error of law committed by a quasi-judicial body is an abuse of discretion and hence reviewable. *Hammond v. Love,* 187 Md. 138, 143-45, 49 A. 2d 75, 77-78 (1946).

Accordingly the question before this Court was whether or not the lower court erred in refusing to issue a Writ of Mandamus holding that the Board was not guilty of arbitrary or capricious action in refusing to award the 136 disputed votes to McNulty.

It is rational to assume that wherever an ambiguity arises with regard to election results, every effort should be made to reasonably ascertain the intention of voters and this is the initial duty of the Board. See *Wilkinson v. McGill,* 192 Md. 387, 64 A. 2d 266 (1949). It is also axiomatic that unnecessary dis-

enfranchisement of voters due to minor errors or irregularities in casting their ballots, in the absence of fraud, should be avoided *Coulehan v. White,* 95 Md. 703, 53 Atl. 786 (1902). In the past this Court endeavored to give the fullest meaning to the aforegoing principles in the cases of *Mahoney v. Sup. of Elections,* 205 Md. 380, 109 A. 2d 110 (1954) and *Mahoney v. Sup. of Elections,* 205 Md. 325, 108 A. 2d 143 (1954). The opinions of Chief Judge Brune and Judge Delaplaine in these cases make it clear that where a Board of Supervisors of Elections makes a mistake of law, the Court has the power by mandamus to correct it.

Keeping these principles before us let us review the present case. The record is devoid of any hint of fraud or chicanery attributable to any of the parties. The evidence further establishes the fact that no substantial number of voters were disenfranchised, indeed, if any were.

That the Board made an administrative error, in not seeing to it that there were sufficient metal covers to lock all of the levers over all blank spaces on the voting machines under their supervision, goes without saying. However, this mishap, in the absence of fraud is not sufficient to warrant a calling of a special election, the reason being, that no voter was actually prevented from voting for the candidate of his choice, if he followed the official election instructions published in the newspaper prior to the election, the directives on the specimen ballots also published, and the instructions of the Attorney General prominently posted in the polling places, and indeed, if they had followed the instructions on McNulty's own sample ballot. In *Wilkinson v. McGill, supra,* at 393, 64 A. 2d 269, this Court held that where such a mistake does not interfere with the fair expression of the will of the voters, the result of the election need not be disturbed.

The Board held a hearing at which evidence was taken and at which McNulty appeared. In an effort to determine whether or not the action of the Board was capricious the Circuit Court, not only reviewed the evidence that the Board had before it but heard additional testimony from appellant Elksnis. The lower court found that the decision of the Board was not arbitrary or tainted with any fraud and affirmed its action.

The Board stated in its written opinion "The Board unanimously feels that the *intent of the voter was probably to cast their vote for Mr. McNulty* * * *". (Emphasis supplied.)

However, it concluded its opinion stating that, relying on advice of their counsel, "there is no legal justification for awarding these votes to them [McNulty and Wagner], *in the absence of evidence showing that levers over the candidates names could not be pulled.*" (Emphasis supplied.)

It is obvious that the Board, felt that it should not be charismatic in its action, just as the lower court felt that to award the 136 votes to McNulty would require an exercise of clairvoyancy insofar as ascertaining the intention of the voters was concerned. The problem faced by the lower court and this Court, in the instant case, becomes apparent when one follows the logical sequence of the argument as to what may result when a voter pulls the lever *under the name* of the candidate, thinking that he is voting for that candidate. A vote in such a manner for McNulty would have been cast in the blank space 7E; but a vote for Clark (7C), under the same hypothesis, would have been cast as a vote for McNulty, and so on up the line of the five levers in the State Senatorial column. Obviously, we would be dealing in the occult, if we endeavored to ascertain for which candidate the 136 votes in line 7E were properly intended. To say that they were all, or even a substantial portion, McNulty's votes would be speculation.

It cannot be completely discounted, as an alternate theory, that those voting on line 7E, did so as a protest vote, as the lower court said, "There is no limit to guessing and speculating as to what may have been intended by those who voted on lines 7E * * *."

The lower court in its opinion made an analogy between the instant case and the error occasionally committed in the days of the paper ballot, where a voter through mistake placed the x outside (instead of in) the square provided opposite the name of the candidate of his choice. In such a situation the ballots were rejected. However, such cases are not helpful here because the rejection was made mandatory by the specific language of the Statute, Art. 33, sec. 85, Code (1951) (see similar provision, Art. 33, sec. 113(a), Code (1957)); *Mahoney v. Sup.*

*of Elections,* 205 Md. 325, 337, 108 A. 2d 143, 148 (1954). The main purpose behind the statute was, and still is, to eliminate the possibility of identification of the ballot with the voter and was aimed at corrupt practices in this area. From the inception of the Australian ballot in this State in 1890 the Legislature was concerned with preserving the secrecy of the ballot and most of the cases challenging election results, one way or another, revolve around the point of the abuse of safeguards adopted to insure this secrecy. In this case we are not concerned with the issue of ballot identification by way of illegal marks.

In *Wilkinson v. McGill, supra,* this Court was faced with a situation where the names of 26 persons were illegally placed upon the registration books and twenty-three of these individuals subsequently cast their vote in an election pertaining to the creation of a sanitary district. The measure failed by 16 votes. The names of the 26 illegally registered persons were known to the Board of Supervisors of Elections. This Court speaking through Chief Judge Marbury said at 402, 64 A. 2d 274:

> "They cannot thrust that burden upon the Court by arguing that there is a probability that such votes were cast for the side having the majority. They must prove, or at least attempt to prove, how the illegal voters voted. *If direct proof cannot be obtained from the illegal voters themselves, other evidence of a circumstantial nature may be offered."* (Emphasis supplied.)

The problem of ascertaining for whom the 136 votes in the present case were intended, is far more complicated than in *Wilkinson, supra,* because in this case no one knows who any of the 136 people may be who pulled lever 7E, intending to vote for McNulty, with the exception of the appellant Elksnis, who testified as to how he disenfranchised himself through his own mistake. Certainly applying the rationale of *Wilkinson,* to the present case, it eliminates the resort to "probability" urged by the appellant.

A recent case, to which this Court's attention was directed by counsel for the appellees, and one much in point is the Pennsylvania case *In Re Primary Election April 28, 1964,*

203 A. 2d 212 (1964), *cert. denied,* 379 U. S. 846 (1964), in which immediately beneath line B, which was a line bearing the names of a number of Democratic Candidates was line C, which was a Republican line, which contained the name of only one candidate located at the extreme end of the line. In the intervening space across most of line C none of the levers were locked and the same problem developed in that case as we face in the case at bar.

The majority of the Pennsylvania Court in a split decision said at 216:

> "What is the use of a State having election laws to govern an election, what is the use of having *clearly marked voting machines,* and Rows on the voting machines which were *clearly marked for a Republican candidate and for a Democratic candidate,* as well as clearly marked sample ballots, if a Court has the right and power—as appellant argues—to ignore and nullify all of these *and substitute its 'guess'* as to whom a voter intended to vote for if he hadn't voted carelessly or hurriedly or absent-mindedly or stupidly or protestingly and illegally?"

and again at 219:

> "The test which appellant urges us to adopt—no matter how window-dressed or camouflaged, is a 'guess' test—it isn't what the voter did that counts, *it's what the Court guesses he intended to do, but didn't.* Such 'guess' test would undoubtedly often produce confusion, uncertainty and interminable delay in election cases, thus jeopardizing a candidate's opportunity for successfully campaigning; it would multiply 'election litigation'; and it would sometimes produce chaos in Government."

It is true, as noted by the able counsel for the appellant, that *In Re Primary Election April 28, 1964, supra,* at 215, there was a Pennsylvania Statue which read: "(d) At primaries, he shall vote for each candidate individually by operating the key, handle, pointer or knob, *upon or adjacent* to which the name of such

candidate is placed."; but this was directive in nature and similar to the instruction published by the Board in Anne Arundel County and the Attorney General's instructions posted in the polling places. Therefore, the existence of the Pennsylvania statute does not mitigate the force with which *In Re Primary Election April 28, 1964,* may apply as supporting authority in this case.

The Court, like the Board, regrets the position in which Mc-Nulty has been placed by the negligence of the Board in not locking the levers in line E. However, it is clear to us that the decision of the lower court was correct in dismissing the petition for mandamus and accordingly we affirmed its action.