518 A.2d 1057

**Donald E. LAMB**

v.

**John R. HAMMOND et al.**

**No. 133 Sept. Term, 1986.**

Court of Appeals of Maryland.

Jan. 7, 1987.

M. Albert Figinski (Franklin Goldstein, Stuart R. Berger and Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., on the memorandum), Baltimore, for appellant.

Diana G. Motz (Frank, Bernstein, Conaway & Goldman, on the memorandum), Baltimore, for appellee.

Argued before MURPHY, C.J., and COLE, COUCH, McAULIFFE and ADKINS, JJ. and RICHARD P. GILBERT, Chief Judge of the Court of Special Appeals and ALAN M. WILNER, Associate Judge of the Court of Special Appeals, Specially Assigned.

WILNER, Judge.

A number of descriptive terms might be used to characterize the race between John R. Hammond and Donald E. Lamb for a seat in the House of Delegates, but "landslide" would surely not be one of them. As the case reaches this Court, Mr. Hammond appears to be the winner over Mr. Lamb by exactly one vote. That hair-thin margin of victory was realized, however, only after the Circuit Court for Anne Arundel County, on a complaint filed by Mr. Hammond, directed the county board of canvassers to count 12 absentee ballots that the board had initially rejected.

Understandably aggrieved by the court's decision, in light of its effect, Mr. Lamb noted an appeal. We granted certiorari prior to any proceedings in the Court of Special Appeals to consider the important and delicate public issues raised in the case.

## I. THE FACTS

Under the Constitution and laws of Maryland, the registered voters of District 30 in Anne Arundel County are entitled to elect three delegates to the House of Delegates. The law generally requires that voting take place at authorized polling stations in the district but permits certain persons—those qualified voters who may be absent from the county on election day or who, by reason of physical disability or confinement, are unable to appear at the proper polling station—to cast their votes by absentee ballot. Md. Code Ann. art. 33, §§ 27-1, 27-2.

At the close of voting in the general election of November 4, 1986, the tallies from the voting machines showed that, of

the six candidates running for the House of Delegates from District 30, the top four were:

| | |
|---|---|
| John C. Astle | 15,825 |
| Michael Busch | 13,475 |
| Donald E. Lamb | 12,553 |
| John R. Hammond | 12,420 |

Two days later, the election board began its canvass of the absentee ballots. Of the ballots so counted for District 30, Mr. Lamb received 345 votes and Mr. Hammond received 475. When those figures were added to the totals from the voting machines, Mr. Lamb remained in third place (and thus entitled to one of the three seats) by three votes—12,898 to Mr. Hammond's 12,895.

Learning that the board had received but declined to count 24 additional absentee ballots, Mr. Hammond filed this action in Circuit Court, contending that the board's refusal to consider those ballots was unlawful and seeking declaratory and injunctive relief. Twelve of the ballots, it appeared, had not even been opened by the board; they were rejected because the board concluded, based on the time that the ballots were received and the postmark on the respective envelopes, that they were not timely under the requirements of Md. Code Ann. art. 33, § 27–9(c) or (d). The other 12 had been opened but rejected by reason of other deficiencies.

Over Mr. Lamb's objection, the court opened the 12 thitherto unopened envelopes and observed, in each instance, that the voter had signed an affidavit that the ballot had been "completed and mailed no later than the day before election." On that basis, the court found those ballots to be timely and ordered the board to include them in its canvass. The board's rejection of the other 12 ballots was affirmed.

Mr. Hammond must have received eight of the 12 additional votes, for he emerged, to the consternation of Mr. Lamb, as the apparent winner, 12,903 to 12,902. Mr. Hammond presumably accepts the court's decision as to the

other 12 ballots, for no cross-appeal has been noted. We are concerned here only with the 12 ballots that the court directed the board to canvass.

Mr. Lamb argues first, as he did below, that, by reason of Md. Decl. of Rts., art. 8, providing for the separation of legislative, executive, and judicial powers, and Md. Const., art. III, § 19, making the House of Delegates the judge of the qualifications and elections of its members, the House of Delegates is the only body competent to resolve this controversy and that the courts have no "jurisdiction" in the matter. Any decision this Court might render, he urges, would be merely advisory to the House of Delegates and thus non-judicial in nature. On the merits of the question, he contends that the Circuit Court erred in directing the board to include the 12 disputed ballots.

## II. JURISDICTION—JUSTICIABILITY

### A. *Introduction*

Jurisdiction in this case was asserted under Md. Code Ann. art. 33, § 27–10, which is part of subtitle 27 of the election code dealing with absentee voting. Subsections (a) and (c) of § 27–10 provide, respectively, that contests "concerning ... the validity of any ballot under this subtitle shall be decided by the board [of canvassers] having jurisdiction of the matter" and that "[a]ny candidate or absentee voter aggrieved by any decision or action of such board shall have the right of appeal to the circuit court for the county to review such decision or action, *and jurisdiction to hear and determine such appeals is hereby conferred upon said courts.*" (Emphasis added.) As § 27–3 of art. 33 declares subtitle 27 applicable to "elections for all candidates ... at any election held in any year," other than certain municipal elections, it is apparent that § 27–10 was intended to apply as well to elections for all such candidates. That includes, of course, elections for delegates to the House of Delegates.

The argument advanced by Mr. Lamb is that the jurisdiction "allegedly conferred" on the Circuit Court by § 27–10,

or presumably by any other law, was "in derogation" of art. III, § 19 of the State Constitution and art. 8 of the Md. Decl. of Rts., and is therefore nugatory. The thesis, in other words, is not that the court has sought to aggrandize to itself or to usurp on its own any right or power committed exclusively to the legislative branch, but rather that the legislative branch was not competent to confer on the courts the jurisdiction it so plainly and unambiguously purported to confer.

## B. *Articulation Of The Issue*

Although when dealing with provisions such as art. 8 or art. III, § 19 courts, including this Court, have often spoken in terms of their "jurisdiction," the issue is not really one of *jurisdiction* in the traditional sense of that concept, but more one of *justiciability*. The circuit courts have long been vested with a limited jurisdiction to review the actions of administrative officials, including election officials, to determine whether those officials have exceeded the authority delegated to them, and, if so, to direct that they act in conformance with the law. See, for example, *Hammond v. Love*, 187 Md. 138, 144, 49 A.2d 75 (1946), where we observed:

> "In *Hecht v. Crook, supra*, 184 Md. [271], 280, 281, 40 A.2d [673], 677, this Court, by Judge Henderson, said: 'Courts have the inherent power, through the writ of mandamus, by injunction, or otherwise, to correct abuses of discretion and arbitrary, illegal, capricious or unreasonable acts; but *in exercising that power* care must be taken not to interfere with the legislative prerogative, or with the exercise of sound administrative discretion, where discretion is clearly conferred.' The election laws do not purport to make conclusive any decisions of supervisors misconstruing the law or their own powers. Decisions contrary to law or unsupported by substantial evidence are not within the exercise of sound administrative discretion and of the legislative prerogative, but are arbitrary and illegal acts."

(Emphasis added.) *See also Mahoney v. Sup. of Elections,* 205 Md. 325, 336, 108 A.2d 143 (1954); *Criminal Inj. Comp. Bd. v. Gould,* 273 Md. 486, 500–01, 331 A.2d 55 (1975); *and cf. McNulty v. Board of Elections,* 245 Md. 1, 8, 224 A.2d 844 (1966).

The issue raised by both art. 8 and art. III, § 19 is one of separation of powers, and, as Chief Justice Warren pointed out for the Supreme Court in *Powell v. McCormack,* 395 U.S. 486, 512, 89 S.Ct. 1944, 1959, 23 L.Ed.2d 491 (1969), "the doctrine of separation of powers is more properly considered in determining whether the case is 'justiciable.'" By that is meant, first, "whether the claim presented and the relief sought are of the type which admit of judicial resolution," and, second, whether the structure of the government (in this instance, the State government) "renders the issue presented a 'political question'—that is, a question which is not justiciable in [State] court because of the separation of powers provided by the Constitution." *Id.,* 516–17, 89 S.Ct. 1961–62.

In judging the first element, according to Chief Justice Warren's analysis, the court must determine "whether 'the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded.'" *Id.,* 517, 89 S.Ct. 1961, quoting from *Baker v. Carr,* 369 U.S. 186, 198, 82 S.Ct. 691, 700, 7 L.Ed.2d 663 (1962). The second element, again taken from *Baker v. Carr,* involves whether there is

> "'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrass-

ment from multifarious pronouncements by various departments on one question.' "

*Id.,* 395 U.S. 518–19, 89 S.Ct. 1962–63.

That, we think, is the proper framework within which to consider the Constitutional issue.

## C. *Constitutional History*

Art. III, § 19 has its roots in the House of Commons. A version of it was included in the first (1776) Constitution of Maryland and in the initial Constitutions of several of the other original States.[1] It is worth noting, historically, that, despite the provision for separation of powers in the accompanying Declaration of Rights, the government created by the 1776 Maryland Constitution was, in many respects, a parliamentary one. Only the House of Delegates was popularly elected. The Senate was elected indirectly by electors; the Governor was chosen, for a one-year term, by joint ballot of the two Houses, and he could not continue in office more than three successive years. The Governor had no veto power over legislation but was directed to sign bills enacted by the Legislature, and he was able to exercise the few Executive powers given him only with the advice and consent of a Council of five people, who were also chosen by the Legislature. Thus it was that this Court, in 1829, was impelled to conclude that "[t]he legislative department is nearest to the source of power, and is manifestly the predominant branch of the government." *Crane v. Meginnis,* 1 G. & J. 463, 472, 19 Am.Dec. 237 (1829).

It is certainly consistent with that structure of government and the evident fear of encroachment, so recently experienced, upon the independence of the Legislature for

---

1. *See* Md. Const. (1776), §§ 9, 17, and 21; *see also* Conn. Const. (1776), § 6; Del. Const. (1776), art. 5; N.Y. Const. (1777), art. X; N.C. Const. (1776), art. X; Pa. Const. (1776), § 9. The historical antecedents and development of provisions such as art. III, § 19 are well described in M. Clarke, *Parliamentary Privilege In The American Colonies,* pp. 133–72 (1971); and I J. Story, *Commentaries on the Constitution of the United States* § 833 (1873). *See also* C. Warren, *The Making of the Constitution,* pp. 419–26 (1937).

the 1776 Constitution to have contained the unqualified statements "[t]hat the house of delegates shall judge of the elections and qualifications of delegates" (§ 9) and "[t]hat the Senate shall judge of the elections and qualifications of senators" (§ 21).

By 1851, although still insistent that the Legislature remain a strong and independent branch of government, the people had become less enamored with its being the "predominant" branch. The Constitution had been amended in 1837 to abolish the five-member Council and provide for the direct popular election of the Governor, and in the 1850–51 Convention a number of significant restrictions were placed on the Legislature's powers and prerogatives.[2] Perhaps in keeping with that sentiment, the Convention also qualified the erstwhile unfettered power of the legislative houses to judge the elections and qualifications of their members. Art. III, § 12 of that Constitution provided that "[e]ach House shall be judge of the qualifications and elections of its members, *subject to the laws of the State*" (emphasis added), and art. X, § 6 authorized the Legislature "to regulate by law all matters which relate to the judges, time, place, and manner of holding elections in this State, and of making returns thereof."

The Convention debates and proceedings shed little light on the ultimate source of this qualifying language, although it is clear that the qualification was not a mere afterthought. The initial proposal by the Committee on the Legislative Department was that each House "shall be judge of the qualifications, elections *and returns* of its members, *but a contested election shall be determined in such manner as shall be directed by law."* Proceedings of the Maryland Constitutional Convention (1850), p. 219 (emphasis added). During consideration of the Committee Report, Delegate Dorsey (who, coincidentally, was the incumbent Chief Judge of this Court) successfully moved to

---

2. *See* Md. Const. (1851), art. III, §§ 17, 20, 21, 22, 23, 31, 37, 45, and 47.

amend the proposal to provide that a contested election "shall be determined *by the House in which such contests may arise* in such manner as shall be directed by law." *Id.*, p. 298 (emphasis added).

Both the Dorsey language and the authority to judge the "returns" of their members were ultimately stripped out of the provision, although there is no clear indication in either the proceedings or the debates as to how, when, or why that was done. It appears to have been done by the Committee on Revision, which, like many style committees, often indulges in substance; but, however it was done, the Constitution emerged, with the approval of the Convention, without that language.

The final language in art. III, § 12 of the 1851 Constitution was carried over intact in the 1864 Constitution. *See* Md. Const. (1864), art. III, § 18. In 1867, without recorded debate, the qualifying language was again retained, though in somewhat modified form. It read then, as it reads now, that "[e]ach House shall be judge of the qualifications and elections of its members, *as prescribed by the Constitution and Laws of the State....*" (Emphasis added.)

The qualifying language and deletion of the power to judge the "returns" obviously was intended to have some meaning. The qualifying language was not in the 1776 Constitution, and it is not in the Federal counterpart (U.S. Const., art. I, § 5, cl. 1). It must be read in conjunction with other parts of the Constitution, including art. I, § 2, requiring the General Assembly to enact laws for the registration of voters; art. I, § 7, directing it to pass laws "necessary for the preservation of the purity of Elections"; art. I, § 8, requiring it to "make provisions for all cases of contested elections of any of the officers, not herein provided for"; and art. I, § 3, authorizing it

"to provide by suitable enactment for voting by qualified voters of the State of Maryland who are absent at the time of any election in which they are entitled to vote and for voting by other qualified voters who are unable to vote personally and for the manner in which and the time

and place at which such absent voters may vote, and for the canvass and return of their votes." [3]

■ Clearly, the framers had in mind that the Legislature would enact laws governing all phases of the conduct of elections, including elections for Senate and House of Delegates, and, in distinction to the then-current Federal view,[4] they determined that any exercise of the prerogatives accorded the respective Houses by art. III, § 19 be "as prescribed" by the Constitution and those laws. It is evident, then, that, although the ultimate power to judge the elections and qualifications of its members continues to reside in the Senate and House of Delegates, respectively, the exercise of that power is, to some extent, constrained by law. The implication of that will become apparent as we consider our earlier pronouncements in this sensitive area.

### D. *Maryland Precedent*

Our first immersion into this troubling eddy was in *Covington v. Buffett,* 90 Md. 569, 45 A. 204 (1900). Mr.

---

**3.** Language similar to art. I, §§ 2, 7, and 8 was in the original 1867 Constitution. *See* Md. Const. (1867), art. I, § 5; art. III, §§ 42, 47, and 49. The precursor of art. I, § 3 was adopted in 1918 to provide for qualified voters who were absent due to military service.

**4.** In 1798, Congress enacted a law governing the taking of evidence in cases of contested Congressional elections. Act of Jan. 23, 1798, ch. 8. That law was amended in 1851 to prescribe specific time limits for giving notices, issuing subpoenas for witnesses, and completing the inquiry. Act of Feb. 19, 1851, ch. 11. In 1857, a contest arose out of the election in the 4th Congressional district of Maryland. Henry P. Brooks, the loser, claimed that the election of November, 1857 was flawed by fraud, intimidation, and violence. In his "memorial" to the House, Brooks asserted that the public authorities in Baltimore were implicated and that, if the disclosures and notices required by the 1851 law were given, witnesses would be intimidated and the inquiry would not be completed within the time limited. The Committee on Elections concluded that the House, exercising a Constitutional authority, was not bound by the law, but that, in that case, it ought to follow the law. The full House agreed that it was not bound by the law, but, siding with the Committee, decided not to depart from it in that instance. *See* 1 A. Hind's Precedents of the House of Representatives, § 833, p. 1084 (1907); *see also* H.R.Rep. No. 105, 35th Cong., 1st Sess.

Covington brought a mandamus action, alleging that the incumbent State Senator for Talbot County, who had been elected for a four-year term in 1897, had accepted a Federal office and left the county, that he had thereupon become disqualified as a State Senator, that a vacancy therefore existed in that office, that Covington had been nominated by the Democratic party for the office, and that the county election board had refused to place his name on the ballot in the general election of 1899. The Circuit Court denied the writ and we affirmed.

We concluded that, under the "qualifications" provision of art. III, § 19, the only tribunal competent to determine whether a vacancy existed was the Maryland Senate and that, unless a vacancy existed, no election could be held for the purpose of choosing a successor. Thus, our ultimate conclusion, expressed at 579, 45 A. 204, was that "[t]he Courts are without jurisdiction to compel the appellees to place the name of the appellant on the official ballot, until the tribunal having the exclusive authority under the Constitution to decide whether a vacancy exists passes upon that question." [5]

We confirmed that view in *Bowling v. Weakley*, 181 Md. 496, 30 A.2d 791 (1943), which raised an almost identical question.

The next two cases to reach this Court after *Covington v. Buffett* involved an issue closer in point to that now before us. In *Price v. Ashburn*, 122 Md. 514, 89 A. 410 (1914), a candidate for State Senate from Worcester County sought mandamus to compel the county board of canvassers to

---

5. Our predecessors may have been aware that the Maryland Senate had indeed exercised its prerogative to decide the qualifications of its members on at least one occasion. In 1865, upon petition by the losing candidate in the November, 1864 election for State Senator for Howard County, the Senate concluded that the winning candidate, Littleton Maclin, was disqualified under art. I, § 4 of the 1864 Constitution because he had publicly expressed sympathy for the Confederate cause. It therefore determined that the petitioner, Hart B. Holton, was duly elected and entitled to the seat. *See* Md. Senate, Report of the Committee on Elections, *Holton v. Maclin*, Document E (1865).

canvass certain votes from the 8th Election District of that county. Although the returns and tally sheets from that district were sent to the board in accordance with the election laws, two of the judges and one of the clerks refused to sign them, stating, in a separate document, their belief that there was "illegal voting." In the absence of the three signatures, the board refused to canvass the votes. The Circuit Court issued the writ and we affirmed.

We concluded that the election judges and the clerk had acted in accordance with the law in making their return to the board and that their refusal to sign the return and tally sheets did not invalidate those documents. We declared further, at 524, 89 A. 410: "It has been repeatedly held, that the duties of canvassing officers are purely ministerial and under the facts of this case, the canvassers could only canvass and declare the result as shown by the returns."

Continuing at 525, 89 A. 410, we said:

"Every sound principle of legal construction, we think, requires us to hold that the canvassing board in this case, had no sufficient reason to justify them in refusing to canvass, and to reject the returns as made, and as was done in this case. Any other construction would lead to endless contests and controversies. It would open the door and put in the power of the judges of election to throw out the returns from any election district, defeat the will of the majority and secure the certificate of election for a candidate who had not received a majority of the votes in the county. The Legislature never could have intended to confer such a power as this upon the judges and clerks of an election."

We recognized that the issue before us was a narrow one of compelling ministerial officials to do their job and act in conformance with the law. The canvassers were simply to count the votes duly returned to them and not make judgments as to whether there was illegal voting. Those judgments, we acknowledged, were committed to the State Senate:

"The Senate of Maryland, itself, under section 19, Article 3, of the Constitution, is the tribunal which has the sole power to decide and judge of the qualifications of its members, to the exclusion of every other tribunal. It is made the final and exclusive judge of all questions whether of law or of fact respecting such election returns or qualifications, so far or as they are involved in the determination of the right of any person to be a member thereof. We express no opinion, and disclaim all intention to investigate the question of the title to the office of senator in this case. *Covington v. Buffett,* 90 Md. 578 [45 A. 204]."

*Id.,* 525, 89 A. 410.[6]

*Canvassers of Election v. Noll,* 127 Md. 296, 96 A. 452 (1915), presented a similar issue, although it involved an

---

**6.** There was indeed precedent for such determinations being made by the State legislative bodies. In 1819, the House of Delegates became embroiled in a bitterly contested election for delegates from Calvert County. The issue was whether there had been illegal voting, and, according to the premier chronicler of the General Assembly, the controversy "ran through virtually the entire session, with an amazing variety of legal technicalities, parliamentary maneuvers, dilatory motions, and delaying tactics of all kinds." C. Everstine, *The General Assembly of Maryland 1776–1850,* pp. 306–11 (1982). Similar kinds of disputes, involving the validity of votes, arose during the 1830's and 1840's. *See* Everstine, *supra,* pp. 504–08. In 1860, the House of Delegates declared the 1859 election for delegates in Baltimore City void by reason of the massive fraud and illegality that characterized that election and expelled the delegates purportedly elected. In 1882, a contest arose over the election for House of Delegates in Anne Arundel County. The Democratic candidates appeared to be the winners, but their opponents contested the election on the ground of fraud. The House Committee on Elections held an extensive evidentiary hearing, lasting 11 days. It concluded that there was indeed considerable fraud in the election, involving primarily the stuffing of ballot boxes with illegal ballots, but that, even if all the votes found to be fraudulent were discarded, the Democratic candidates would still be the winners. The House accepted the Committee Report and seated the Democratic candidates. *See* House Journal, pp. 1308–15, 1435–36 (1882); *see also* House of Delegates, Document H (1882), consisting of the testimony taken by the Committee on Elections. Similar contests also erupted in 1886 (Caroline County), 1888 (Talbot County), 1892 (Calvert County), and 1896 (Calvert County). *See* C. Everstine, *The General Assembly of Maryland 1850–1920,* pp. 375–82

election for court clerk rather than legislator and thus implicated art. IV, § 12 of the Constitution rather than art. III, § 19.[7] The contest was between Noll and O'Malley; O'Malley was declared the winner by 47 votes. In a mandamus action, Noll complained that the board of canvassers had improperly rejected the returns from one precinct in the 2d election district showing a 45–vote plurality for Noll, and that it had improperly counted three votes for O'Malley in the 6th election district, thereby reversing what should have been Noll's one-vote victory. The board defended its rejection of the 2d district votes on the basis of its belief that there had been tampering with the ballot boxes; as to the 6th district, the board observed on one of the two tally sheets three marks which it concluded represented valid votes that had not been counted or certified by the election judges.

We recognized the Constitutional issue at the outset and disposed of it with this comment, at 299, 96 A. 452:

"A contest over an election to this office must, of course, be made, if at all, before the House of Delegates, as provided by section 12, Article 4 of the Constitution, *but that does not affect the power of the Court to require the Board of Canvassers to correct errors, if any, as provided for in section 86 of Article 33 of the Code.*"

(Emphasis added.)

On the merits of the complaint, we followed our holding in *Price v. Ashburn* that canvassers are ministerial officials who are obliged to "canvass and declare the result as shown by the returns," and thus concluded they had no right or authority to reject ballots duly returned to them.

---

(1984). In nearly all of the cases decided in the legislative chambers, the issue was either one of the qualifications of the apparent winner or whether the election was tainted by fraud, intimidation, or illegality.

**7.** Art. IV, § 12 provides that, in any contested election for judges, clerks, or registers of wills, the House of Delegates "shall judge of the election and qualification of the candidates at such election...."

127 Md. at 300–01, 96 A. 452. The condition of the ballot boxes "was, under the statute, of no more concern to the canvassers while acting in that capacity, than was the condition of any election booth which might be returned." The same principle applied with respect to the returns from the 6th district. The canvassers had no authority to disregard the certificates of the election judges and count more votes than were certified, especially when the three extra marks were on only one of the two tally sheets.

Finally, just four years ago, we touched on the issue again in *Duffy v. Conaway*, 295 Md. 242, 455 A.2d 955 (1983). The case arose out of the election for register of wills in Baltimore City; the loser, Duffy, sought, in effect, to disqualify the winner, Conaway, on the ground that Conaway had violated the Corrupt Practices Act. That Act, among other remedies, authorized a court proceeding to determine whether the successful candidate had engaged in unlawful conduct. The law made clear, however, that the court had no authority, in cases involving registers and certain other Constitutional officers, to declare the election void; the court was directed simply to transmit its findings to the State election board, which, in turn, would send them to the official or body Constitutionally empowered to decide the contest.

We found that scheme tantamount to having the courts issue merely advisory opinions which, we concluded, represented a non-judicial function barred by the separation of powers provisions in Md. Decl. of Rts., art. 8. In a concluding footnote at 63, 455 A.2d 955, we disclaimed any implication that the law would be constitutional "if amended to authorize a court to *decide the controversy and void the election*," for such a provision "might still present serious constitutional problems under provisions such as Art. IV, § 12, or Art. III, § 19, of the Maryland Constitution which vest jurisdiction in another governmental body to judge the election and qualification of candidates for certain offices." (Emphasis added.)

## E. *Analysis*

■ It is evident from our earlier decisions, read in the light of the historical development of art. III, § 19, that there is a role for both the courts and the Legislature in resolving questions over the conduct of elections for seats in the General Assembly. Those roles are complementary rather than conflicting, and if each body stays within its proper and assigned bounds there will be no transgression against separation of powers.

The right to vote is basic. It is guaranteed by the Federal Constitution, by the Maryland Declaration of Rights, and indeed by the very first provision in the State Constitution, art. I, § 1. Pursuant to its Constitutional authority to pass laws for the preservation of the purity of elections and, more particularly in this case, to provide for absentee voting "and for the manner in which and the time and place at which such absent voters may vote, and for the canvass and return of their votes," Md. Const., art. I, § 3, the Legislature has created boards of canvassers, given them explicit directions how to collect and count votes, and carefully limited their authority to the performance of that function. At least since 1896, it has authorized the courts to perform their ancient and traditional role of seeing to it, upon complaint, that these administrative officials follow those directions and remain within the bounds of their circumscribed authority.[8]

■ The performance of that role is fully judicial. Harking to the analysis in *Baker v. Carr, supra,* 369 U.S. 186, 82 S.Ct. 691, and *Powell v. McCormack, supra,* 395 U.S. 486,

---

8. The earliest conferral of jurisdiction upon the courts in this area seems to have been by 1896 Md.Laws, ch. 202, which substantially revised the State election laws. Subsection 79, part of the subtitle on canvassing boards, provided that, whenever it appeared by affidavit "that errors have occurred in the determination of the board of canvassers," the Circuit Court could "require said board to correct such errors or show cause why such corrections should not be made," and, if the board refused, the court "may compel said board, by a writ of mandamus, to correct such errors."

89 S.Ct. 1944, the duty imposed on these officials can be "judicially identified," its breach can be "judicially determined," and a protective remedy can be "judicially molded."

■ We do not perceive this limited role as trampling upon "a textually demonstrable commitment of the issue to a coordinate political department" or upon the other considerations noted in *Baker* and *Powell.* In the first place, we are not being asked to overturn any legislative determination already made, or to enjoin the House of Delegates from deciding a contest properly presented to it. *Compare Morgan v. United States,* 801 F.2d 445 (D.C.Cir.1986); *Barkley v. O'Neill,* 624 F.Supp. 664 (S.D.Ind.1985). Moreover, art. III, § 19 itself makes clear that the power vested in the respective houses of the Legislature is not unbridled. In judging the elections and qualifications of their members, they must act "as prescribed by the Constitution and Laws of the State." They are not empowered, and we hardly think that as reasonable bodies they would ever suggest the power, to act arbitrarily or capriciously, to disenfranchise people who are legally entitled to vote and who have cast their ballots in full compliance with the law, or, conversely, to credit votes that are patently unlawful. That would not be as prescribed by law. *Cf. Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966).

It is evident then, that upon a timely complaint that canvassing officials have improperly refused to canvass votes that were lawfully cast, the appropriate court has, and may exercise, its traditional jurisdiction. It may inquire into the matter, determine whether the administrative officials have carried out their ministerial duties in accordance with the law, and, if they have not, command them to do so. That is all that the Circuit Court was asked to do in this case.[9]

---

**9.** We have resolved the issues of jurisdiction and justiciability primarily on the basis of Maryland law because we think that the body of that law, as we have expounded it, is adequate for the purpose. We recognize that some courts in other States have interpreted counter-

## III. THE MERITS

■ In one important sense, the merits of a complaint such as that now before us cannot be entirely divorced from the underlying issue of justiciability. In this delicate area, the power to inquire is necessarily broader than the power to act, for, if not clear from a mere reading of the complaint, the facts developed in the judicial proceeding may demonstrate that the controversy is indeed one that is beyond judicial resolution. The court can inquire as to why disputed ballots were or were not canvassed, but its authority to reverse the administrative decision will depend on the nature of the reasons given.

### A.  *The Nine Domestic Ballots*

Of the 12 absentee ballots still in dispute, nine were mailed from within the United States. The timeliness of those ballots is governed by Md.Code Ann. art. 33, § 27–9(c)(1), which, in pertinent part, regards an absentee ballot as timely if:

"(i) It has been received by the board prior to the closing of the polls on election day; *or*

(ii)1. It was mailed before election day;

2. The United State[s] Postal Service, or the postal service of any other country, has provided verification of that fact by affixing a mark so indicating on the covering envelope; *and*

---

part provisions in their Constitutions differently. We believe that our views are consonant with those expressed by the Supreme Court in *Powell v. McCormack, supra,* 395 U.S. 486, 89 S.Ct. 1944, and *Roudebush v. Hartke,* 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972), and by the U.S. Court of Appeals for the 7th Circuit in *McIntyre v. Fallahay,* 766 F.2d 1078 (7th Cir.1985). *See also State ex rel. Olson v. Bakken,* 329 N.W.2d 575 (N.D.1983).

3. The board receives the ballot from the United States Postal Service not later than 4 p.m. on the Wednesday following election day."

(Emphasis added.)

The ballots in question were not received prior to the closing of the polls on election day and so do not comply with subsection (c)(1)(i). To be timely, therefore, they must satisfy the requirements of subsection (c)(1)(ii).

The ballots were indeed received by the alternative deadline set forth in subsection (c)(1)(ii)3; the question is when they were mailed. In each instance, the covering envelope is postmarked November 4—election day—and, although it is entirely possible that some or all of them were actually deposited in a U.S. mailbox prior to election day, it is beyond dispute that the postmark does not provide "verification of that fact." It was on that basis, and that basis alone, that the board rejected the ballots.

The problem was that the written instructions given to the absentee voters were at best ambiguous and at worst actually misleading on this point. Notwithstanding the clear purport of subsection (c)(1)(ii) that *each* of the three conditions, including postmark verification, must be satisfied if the ballot is received after closing of the polls, the instructions stated, in two places, that "[a] ballot received by mail will be considered timely until 4 P.M. on the Wednesday following election day, provided it bears a postmark verifying it was mailed before election day *or* the signed affidavit of the voter indicates that it was marked and mailed before election day." [10]

(Emphasis added.)

It was because of that instruction, cast in the disjunctive, that the court opened the envelopes to see if there was an

---

10. Md.Code Ann. art. 33, § 27–8, states that "[t]he printed instructions for the casting of absentee ballots shall be prescribed by the State Administrative Board of Election Laws...." We assume that these instructions were so prescribed. There is nothing in the record to indicate who prepared the instructions—the only agency identified on

affidavit attesting to a timely marking and mailing. In each instance, the court found an unwitnessed, unattested affidavit of the voter stating, in relevant part, that "[t]he ballot, if mailed, was completed and mailed no later than the day before election." Acknowledging that "[t]he law clearly says that in this situation they're supposed to be mailed *before* election day" and that "the presumption is that they were mailed *on* election day based on the postmark" (emphasis added), the court nonetheless decided that "we ought to count votes from voters who have complied with the instructions on the ballot...." That was the basis of the court's order to canvass the nine domestic ballots.

### B. *The Three Foreign Ballots*

Three of the 12 ballots were mailed from outside the United States. The timeliness of those ballots is governed by § 27–9(d) and (e). Subsection (d)(1) directs that a ballot received from a location outside the United States be considered as received timely if,

"(i) It has been received by the board from the United States Postal Service not later than 4 p.m. on the second Friday following the election day; *and*

(ii) 1. It was mailed before election day; *and*

2. The United States Postal Service, or the postal service of any other country, has provided verification of that fact by affixing a mark so indicating on the covering envelope."

(Emphasis added.)

Subsection (e) excuses compliance with subsection (d)(1)(ii)2 in one circumstance. It provides: "For the purposes of subsections (c) and (d), a voter's affidavit that the ballot was completed and mailed before election day shall suffice *if the postal service of the country from which the ballot was mailed does not provide a postmark on that ballot.*" (Emphasis added.)

---

the instructions is the Anne Arundel County election board—and we note that, if an official form has been prescribed by the State Board, it was not done by any regulation appearing in COMAR.

Each of the three foreign ballots was postmarked by the Army Post Office. The record does not indicate the country or countries of origin or, if the ballots were mailed other than through the Army Post Office, whether the postal service of that country (or countries) would have provided a postmark for the ballots. As is the case with the domestic ballots, the foreign ballots at issue are postmarked November 4—election day—and thus fail of the "verification" required by subsection (d)(1)(ii)2. That is why the board rejected them.

Here, too, unfortunately, the instructions provided by the election board are ambiguous. In two places, they state:

"A ballot received by mail will be considered timely until 4 P.M. on the Wednesday following election day, provided it bears a postmark verifying it was mailed before election day or the signed affidavit of the voter indicates that it was marked and mailed before election day. For a ballot received from an overseas location in a general election, the extended deadline for timeliness is the second Friday after election, *provided it bears verification that it was marked and mailed before election day.*"

(Emphasis added.)

Believing those instructions to be misleading and indicating doubt as to whether the APO postmarks truly reflected the actual date of mailing, the court opened the envelopes, noted that each contained a voter's affidavit that the ballot was completed and mailed prior to election day, and, on the basis of those affidavits, ordered the board to canvass the votes.

## C. *Analysis*

It is clear beyond cavil that the nine domestic ballots fail to satisfy the conditions for timeliness set forth in § 27–9(c)(1) and that the three foreign ballots fail to satisfy the analogous conditions set forth in § 27–9(d)(1). It is equally clear, on this record, that they cannot be saved by virtue of § 27–9(e). Read in the light of §§ 27–9(c)(1)(ii) and (d)(1)(ii), subsection (e) was obviously intended to apply only where

the postal service used by the voter does not provide a postmark, which would make compliance with the "verification" requirements of subsections (c)(1)(ii) and (d)(1)(ii) impossible. That was not the case here; all 12 envelopes were indeed postmarked by an official United States postal service.

Conceding at least technical noncompliance with subsections (c)(1)(ii)2 and (d)(1)(ii)2, Mr. Hammond seeks to defend the court's action on two grounds: (1) that the requirement of "verification" by postmark is merely "directory," that the only "mandatory" requirement is that the ballot be received by the alternate deadline, and that, as the "mandatory" requirement has been satisfied, there has been substantial compliance with the law, and (2) that a voter should not be disenfranchised for technical noncompliance with the statutory requirement where he or she follows the instructions of the election officials.

The directory/mandatory argument is based on the provision in both subsections (c) and (d) that any ballot received "after the deadline established in this subsection may not be counted." That sanction, he says, is a limited one, applying only to late *receipt* of the ballot; it does not apply to the requirement of timely *mailing* or, more particularly, to the requirement of verification of timely mailing.

We do not agree. For one thing, this Court in recent times has departed from the notion that clear commands or conditions imposed by a legislative body may be disregarded on the theory that they are merely "directory." *See, for example, Office & Prof. Employees Int'l v. MTA*, 295 Md. 88, 96, 453 A.2d 1191 (1982), where we observed that "where a statute authorizes or permits a person or agency to take a certain type of action in a particular manner, such manner becomes a mandatory limitation, and the action must be taken in conformity with it."

■ That is particularly apt in this case. The Legislature has accorded absentee voters a special privilege not shared by other voters—the privilege of having their vote count

even though received by the election officials after the polls have closed. Unqualified, or qualified only by a deadline on *receipt* of the ballot, that privilege could become a distinctly unfair political advantage; it would allow a group of voters actually to *cast* their ballots after the polls had closed, and thus open the way for some very unwholesome machinations.[11] The Legislature was very careful to avoid that possibility by requiring not only that the ballot actually be mailed before election day but also that there be an official verification of that fact by means of a postmark. Given the care that the Legislature has traditionally shown in crafting the State election laws, we cannot conceive that it intended those requirements to be other than mandatory. *Compare Hammond v. Hickel,* 588 P.2d 256 (Alaska 1978), *cert. denied,* 441 U.S. 907, 99 S.Ct. 1998, 60 L.Ed.2d 376 (1979), *and Willis v. Thomas,* 600 P.2d 1079 (Alaska 1979), both decided under a statute, since amended by the Alaska Legislature, that was somewhat different from § 27–9(c) and (d).

The second argument is more troubling, and indeed it has found favor in some courts. *See, for example, In re Recount of Ballots Cast In General Election,* 457 Pa. 279, 325 A.2d 303 (1974); *In re Contest of 1979 General Election, Etc.,* 489 Pa. 404, 414 A.2d 310 (1980); *Hawkins v. Persons,* —— Ala. ——, 484 So.2d 1072 (1986). Although the Alabama case presented a unique and rather compelling circumstance, the Pennsylvania court actually directed the counting of ballots that the law flatly declared were "void and shall not be counted." *In re Recount of Ballots, supra,* 325 A.2d at 308.

This Court has never gone that far. We have, on a number of occasions, expressed the view that "unimportant mistakes made by election officials should not be allowed to

---

**11.** It is important to keep in mind that a person does not have to be very far away to qualify as an absentee voter. With nearly instant predictions on radio and television based on exit polling, late voting by absentee voters can create real unfairness in an election.

thwart the will of the people freely expressed at the ballot box" or that "mere irregularities ... should not be allowed to set aside what the voters have decided" (*Wilkinson v. McGill,* 192 Md. 387, 393, 64 A.2d 266 (1949); *Mahoney v. Sup. of Elections,* 205 Md. 380, 109 A.2d 110 (1954); *McNulty v. Board of Elections, supra,* 245 Md. 1, 224 A.2d 844 (1966)), thus suggesting that more serious errors might be taken into account. And we have sometimes endeavored to sustain votes that were in substantial compliance with the requirements of law. *See Coulehan v. White,* 95 Md. 703, 53 A. 786 (1902); *Town of Landover Hills v. Brandt,* 199 Md. 105, 85 A.2d 449 (1952). But we have never sanctioned the counting of ballots that were plainly in violation of a law particularly designed to protect the integrity of the elective process. Indeed, in *Hammond v. Love, supra,* 187 Md. 138, 49 A.2d 75, we directed the issuance of a writ of mandamus compelling the election officials to reject certain ballots that were not signed or initialed by the election judge, as required by law. We were aware that the voters were innocent in the matter, but we were also aware that the requirement of initialing ballots had been regarded by the Legislature as an "important safeguard." We said, at 149, 49 A.2d 75:

"It is unfortunate that voters should lose their votes by oversight of election officials—and by their own failure to notice that they have not been given authenticated ballots. But, as has often been said, *it would be a greater evil for the courts to ignore the law itself by permitting election officials to ignore statutory requirements designed to safeguard the integrity of elections, i.e., the rights of all the voters.*"

(Emphasis added.)

In the present posture of this case, the issue is a dual one: (1) can election officials effectively change the law by giving erroneous, ambiguous, or misleading instructions to the voters, and (2) can a court command a board of canvassers to credit the improper instructions rather than the law? Absent some more compelling circumstance than

is present here, the answer to both questions must be "no." As we have said, the court was justified in taking cognizance of Mr. Hammond's complaint and inquiring into the reasons for the board's rejection of the disputed ballots. It was not justified, however, in directing the board to favor the board's instructions over the clear requirements of the law. Even apart from the "separation of powers" problem, but especially in light of it, that was simply an inappropriate exercise of judicial review.

JUDGMENT OF CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; JUDGMENT HEREBY ENTERED DIRECTING BOARD OF STATE CANVASSERS TO CERTIFY ELECTION RESULTS FOR HOUSE OF DELEGATES FROM DISTRICT 30, ANNE ARUNDEL COUNTY, IN ACCORDANCE WITH THIS OPINION; APPELLEE TO PAY THE COSTS; MANDATE TO ISSUE FORTHWITH.